Peg Fasciani, Doing Business as White's Restaurant, Appellant, v Village of Ossining, Respondent.

Meat Center, Inc., Appellant, v Village of Ossining, Respondent.

Second Department, July 18, 1977

*Hecker, Sheer & Beilenson (Norman Sheer* of counsel), for appellants.

*Hugh A. Lavery, Jr.,* for respondent.

Shapiro, J. In these companion actions for injunctions against the defendant Village of Ossining, plaintiffs appeal from orders which denied their motions for summary judgment and granted defendant's applications for summary judgment in its favor. We affirm.

### THE ISSUE

The issue in each case—and one of first impression in this State on an appellate level—is whether a municipality which has acquired real property for a public use by purchasing it directly from the owners at a negotiated price rather than by

condemnation may refuse to compensate month-to-month tenants of the premises for their trade fixtures.

### THE FACTS

Plaintiff Meat Center, Inc. owned and operated a butcher shop and grocery store at 56 Spring Street, Ossining, since 1961. It occupied the premises under a lease which originally ran to 1970 and was thereafter renewed with an expiration date of March 31, 1975. After that date it continued to occupy the premises without a lease. Plaintiff Fasciani, in 1972, acquired and operated a restaurant at 54 Spring Street in Ossining under a lease which expired on October 1, 1974 and also continued in possession thereafter without a lease. Each plaintiff had trade fixtures in the leased premises. Those in Fasciani's premises were of a claimed value of $18,006. Those in the Meat Center, Inc. were of a claimed value of $49,028.

On March 18, 1975, just prior to the expiration of the Meat Center's lease, the village authorized acquisition of the Spring Street property occupied by the plaintiffs as a site for a new municipal fire house or other municipal use. Its owners had offered it for sale to the village for $20,250, which, the village's resolution of authorization declared, "represents the fair market value of said real property". Thereafter, on July 2, 1975, title was conveyed to the village for the sum of $32,500. Defendant explains the increase in the purchase price as the result of a rejection of its offer by the owners because they had, in the interim, received an offer of $30,000 which the village's Board of Trustees met by raising its offer to $32,500.

The contract of sale, although providing that all fixtures attached to the premises were included in the sale, specifically excluded "fixtures and appliances installed and owned by the tenants."

On August 4, 1975 the plaintiff Fasciani entered into a lease with the village covering the restaurant premises, under the terms of which she became a tenant from month to month commencing as of July 1, 1975. The lease provided for its cancellation on 30 days' notice by the tenant and at any time by the village "in order to accomplish demolition of the subject building." On August 12, 1975 the Meat Center entered into an identical month- to-month lease with the village.

On March 22, 1976 the village served the Meat Center with a statutory notice to vacate by May 31, 1976 and on April 1,

1976 the village served a similar notice on Fasciani. Thereafter, in accordance with rules and regulations promulgated by the collector-treasurer of the village under the authority of section 74-b of the General Municipal Law, the defendant obtained estimates of the cost of moving expenses and was prepared to pay the plaintiffs the amount of such reasonable and necessary expenses or to pay them a sum in lieu of moving expenses as provided in the rules and regulations issued under that law by the village.

The plaintiffs vacated the premises, but prior thereto commenced these actions to enjoin the termination of their leases until condemnation proceedings for their trade fixtures were instituted, or in the alternative, that the court determine their damages to be the value of their fixtures. Both plaintiffs, in the affidavits in support of their motions for summary judgment, declared that they had vacated their premises, discontinued their businesses and sold their fixtures as assets of a liquidating business and had received only salvage value therefor.

After service of answers to each complaint by the defendant, both plaintiffs moved for summary judgment. Defendant then sought summary judgment in its favor.

The parties entered into stipulations in each suit which indicated that each plaintiff was duly served with a 30-day notice to vacate on July 29, 1976 requiring each plaintiff to vacate the premises each occupied no later than August 31, 1976, that various items used in each plaintiff's business would be left in the building after August 31, 1976 and that there was a disagreement between the parties as to whether the defendant was liable to compensate the plaintiffs for those items, which disagreement had led to the instant actions. The stipulations provided an agreed machinery for public sale of those items no later than September 30, 1976, with the proceeds of such sale to be held in escrow by the village to be applied to payment of any award made to each plaintiff in the pending actions or, if no award were made, to be paid over to each plaintiff. The stipulations also provided that upon the vacating by the plaintiffs of the premises the actions for an injunction should be deemed actions for damages.

### THE DECISION AT SPECIAL TERM

Special Term denied the plaintiffs' motions and granted summary judgment dismissing the complaints.

The court noted that the village's acquisition of property by contractual purchase is different from appropriation by condemnation; that the contract of sale specifically excluded the tenants' fixtures; that the plaintiffs-tenants had no leases at the time defendant acquired title to the property and that the plaintiffs had been given the statutory notices to vacate, which notices in all respects complied with the notice requirement of their month-to-month leases. The court then declared that under those circumstances the law makes no provision for a tenant to be compensated for its fixtures and that the sole obligation of the village (under General Municipal Law, § 74-b) was to pay their tenants their reasonable and necessary moving expenses.*

### THE LAW

There is no dispute about the fact that if the village had obtained the real property by condemnation, plaintiffs would, in the condemnation proceeding, be entitled to receive the value of their trade fixtures (see *Jackson v State of New York,* 213 NY 34, 35; *Matter of Willcox,* 165 App Div 197, 200), not just their salvage value (see *Marraro v State of New York,* 12 NY2d 285). It is also clear that if the village had elected to take the property by condemnation, the fact that the plaintiffs' leaseholds were on a month-to-month basis and were themselves, therefore, of little value could not serve to divest the tenants of their right to be paid for their trade fixtures *(Marraro v State of New York, supra; Matter of City of New York [Allen St.],* 256 NY 236, 245).

But here there was no condemnation. The owners were willing to sell to the village the property it needed for a municipal purpose. After some negotiations the village was able to purchase the property at a cost substantially less than if it had proceeded by condemnation, since the net effect of the village's election to purchase the land from the owner by a negotiated sale was to enable it to avoid having to compensate the plaintiffs for their trade fixtures at their market value as part of a going business, an amount which may have been substantially in excess of the purchase price it paid for the real property (the total value of the fixtures, according to the complaints of both plaintiffs exceeds $67,000).

My search of the texts and case law has yielded no case

---

* It is conceded that the village stands ready to make that payment.

directly in point, nor do plaintiffs cite authority to support their claim to be compensated for their trade fixtures on the basis of their value as part of a going business. There are, however, some holdings which support the conclusion reached by Special Term. Thus, in *Greater N.Y. Fillet Co. v Beame* (NYLJ, Nov. 8, 1976, p 7, col 3), Mr. Justice ASCH dealt with a claim for the value of trade fixtures in plaintiff's leased premises purchased by the City of New York for a public purpose, the South Street Seaport. Although the city had initiated condemnation proceedings against the premises in which plaintiff's business was located, it canceled them and purchased the fee through a private sale. The plaintiff, which apparently leased a portion of the purchased premises, brought action for a judgment (1) declaring that the property, including the trade fixtures owned by it, was acquired by the city on account of its acquisition of the underlying fee for the public purpose indicated and (2) directing the city to institute condemnation proceedings for ascertainment of the just compensation due it. The court granted a motion to dismiss the complaint for failure to state a cause of action, saying (p 11, col 1): "Upon its acquisition by purchase of title to the subject premises, the City was placed in the same relationship with the plaintiff as would have any other private purchaser of the fee. The City took subject to the existing leases and became the new landlord. Although upon an actual condemnation, compensation must be paid for trade fixtures which are deemed to have been acquired, following acquisitions pursuant to a private sale, trade fixtures retain their status by definition as items which a tenant has a right to remove at the termination of the tenancy. Marraro v State, 12 NY2d 285 (1963); In re Horace Harding Expressway (City of New York), 151 NYS2d 946. The City's acquisition of property by purchase is clearly different from acquisition by condemnation and does not result in the same obligation to pay just compensation. In re Harlem River Drive (City of New York, 202 Misc. 540). The contention of plaintiff that it is entitled to be compensated because the plans of the City would not appear to permit plaintiff's continued use of the subject premises is without merit. The existence of plans for public use of property contrary to an owner's interests does not constitute a de facto taking. 76 Crown Street Corporation v. City of New York, 35 AD2d 1005."

The foregoing opinion is of interest not only for its clear

declaration that a municipality which purchases real property by negotiated sale is in the same position with respect to it as any other private purchaser of the fee, but also for its comment that the existence of plans for public use of property contrary to an owner's interests does not constitute a *de facto* taking. Plaintiffs, in the instant cases, argue in their briefs, incorrectly in my view, that the village's purchase of the premises in which they were tenants is a form of *de facto* taking. Since the village took the fee, it purchased subject to the same duties the previous owner had to the plaintiffs; it was not engaged in any *de facto* taking. Therefore, when the village purchased the fee of the premises in which the plaintiffs were month-to-month tenants they would, as the court noted in *Greater N.Y. Fillet Co. (supra)*, retain with respect to their fixtures the same rights which they had as tenants, including the right to remove the fixtures at the termination of their tenancies, a right which the defendant was completely willing to accord them.

Also of relevance to the issue here under consideration is *Matter of College Point Ind. Park* (NYLJ, Nov. 19, 1975, p 10, col 3), in which the claimants were tenants of land which the City of New York was to use for the College Point Industrial Park Urban Renewal Project. The claimants sought a compensation award for the amusement rides they had erected on the land after renting it from the city for that purpose on a 30-day lease automatically renewed for successive 30-day periods terminable on 30 days' notice by either party. The original lease was made on March 29, 1971 and the order of condemnation was entered on December 1, 1972. In rejecting the tenants' claims for compensation, the court found that they took a calculated risk when they installed their rides with knowledge of the impending condemnation and were, therefore, not entitled to a condemnation award. Of course, in the cases here under consideration, the trade fixtures for which plaintiffs sought compensation were originally installed when both plaintiffs had leases for substantial periods of time. But both plaintiffs were aware, when they continued as tenants without a lease from the original owner, that the sole right they would have with respect to their trade fixtures would be to remove them if their tenancies were terminated. They are also chargeable with knowledge that when they entered into month-to-month leases with the village they would have a right to compensation for their trade fixtures at the market value

thereof only if the village acquired the premises through condemnation.

I am not unaware of the fact that the defendant's action here in purchasing the fee from the plaintiffs' landlord after their leases for a term of years had expired, instead of obtaining title to the fee by exercise of its power of eminent domain, may well have deprived plaintiffs of a means of recouping the full market value their trade fixtures would have brought if they had been sold as part of a going business. But the plaintiffs would have had no such right if the owner of the fee of which they were tenants had refused to renew or extend their leases and ordered them to remove their fixtures from his real property. I can find nothing in the law governing the right of a municipality to acquire real property for a public purpose which denies the municipality the right to acquire the real property by direct purchase rather than by the exercise of the power of condemnation.

Furthermore, the village, when it negotiated the purchase of the premises, could have insisted that its contract with the owners contain a condition that the owners deliver the premises free and clear of any tenancy. Under such circumstances the sellers would then have had to oust the tenants prior to the transfer of title to the premises to the village which, of course, they could readily have done since the plaintiffs were occupying the premises without a lease. In such case the tenants would clearly have had no legal recourse against the sellers and no choice except to remove their fixtures when they vacated the premises, or to abandon them, or to sell them for their salvage value. It would be ironic if plaintiffs were now to profit from the fact that the village did not use this device to protect itself from the claims they are now making for full reimbursement of the market value of their fixtures.

I can find no authority in the law for denying a municipality purchasing real property for a public purpose the right to acquire such property by private purchase from owners willing to sell. Rather, various sections in article 5 of the General Municipal Law speak in terms of the power of any municipal corporation to acquire land "by purchase, gift, lease or condemnation" (General Municipal Law, § 72-a; see, also, General Municipal Law, §§ 72-d, 72-e, 72-f), thus negating any inference that such acquisition must be by condemnation only; section 74 of the same act grants municipal corporations the

power of condemnation, but declares that the power may be used only "if it is unable to agree with the owners for the purchase thereof".

Plaintiffs' reliance on *Almota Farmers Elevator & Warehouse Co. v United States* (409 US 470) is misplaced. There the claim for leasehold and fixtures was made when the government, after direct purchase of the fee, moved to condemn petitioner's lease of the fee, which had seven and a half years to run. Petitioner had erected buildings, structures and appurtenances of a grain elevator on the real property and the issue was whether the value of petitioner's permanent improvements should be measured by salvage value or by what a willing buyer would have paid for them, taking into account the possibility that the lease might be renewed as well as that it might not.

Since *Almota* involved a condemnation proceeding of a long-term leasehold it can serve as no precedent for the instant case. Nevertheless, plaintiffs quote the following language from a concurring opinion by Mr. Justice POWELL, in which Mr. Justice DOUGLAS joined (409 US at p 480): "The result should not be different merely because the Government arranged to acquire the fee interest by negotiation rather than by condemnation. Apart from cases where, as in *United States v. Rands,* 389 U. S. 121 (1967), the Government has a property interest antedating but within the bounds of its present project, it would be unjust to allow the Government to use 'salami tactics' to reduce the amount of one property owner's compensation by first acquiring an adjoining piece of property or another interest in the same property from another property owner." But here we have no "salami tactics" being used to reduce one property owner's compensation. Here we have a purchase of all of the fee owner's interest, which in no way encompasses an effort by the governmental buyer to obtain the plaintiffs' trade fixtures at a salvage value price, but rather an effort to insure the removal of those fixtures from the property it was purchasing.

There may be cases in which the owner of the fee and the purchasing governmental unit collude to include in the price paid to the selling owner some of the proceeds which would otherwise be payable as a condemnation award to the tenants for their trade fixtures, thereby diminishing the over-all cost to the governmental purchaser by denying the tenants the

market value of their fixtures, but the plaintiffs make no such claim here. Hence we do not reach that issue.

Accordingly, the orders appealed from should be affirmed.

HOPKINS, J. P., MARGETT and SUOZZI, JJ., concur.

Order of the Supreme Court, Rockland County, entered in Westchester County on January 24, 1977, affirmed, with $50 costs and disbursements.

Order of the Supreme Court, Westchester County, entered January 24, 1977, affirmed, with $50 costs and disbursements.

