PATRICK MEDIA GROUP, INC., Plaintiff-Appellant, v. DU PAGE WATER COMMISSION *et al.*, Defendants-Appellees.

First District (6th Division)   No. 1—92—2254

Opinion filed February 10, 1994.

Robert J. Weber, of Chicago, for appellant.

Nicholas J. Bua and Charles D. Knight, both of Burke, Bosselman & Weaver, of Chicago, for appellees.

JUSTICE McNAMARA delivered the opinion of the court:

Plaintiff, Patrick Media Group, Inc. (PMG), filed a complaint against defendants, Du Page Water Commission (Commission) and its general manager, James J. Holzwart, seeking damages and equitable relief for the alleged "taking" of three of its billboards. The billboards were situated on a parcel of land formerly owned by B&O Railroad Company (Railroad) and acquired by the Commission as part of a project to supply Lake Michigan water to the residents of Du Page County. After the Commission acquired the property, it eventually terminated the two leases and one license (also referred to as "billboard agreements") governing the billboards and requested that PMG remove them from the land. PMG refused, claiming that the Commission's purchase of the land was tantamount to a constitutional taking, for which the Railroad and PMG, as owner of the billboards, were owed just compensation. In its complaint, PMG sought compensation for the taking of the billboards only, and not for the taking of the leaseholds and license or for the termination of these interests.

The Commission filed a counterclaim seeking recovery for unpaid fees under one of the billboard agreements and for the costs incurred in removing another billboard from the property after PMG refused to do so.

Following a bench trial, the trial court entered judgment in favor of the Commission and against PMG on both PMG's complaint and the Commission's counterclaim. The court held that the Commission's acquisition of the subject property was not a taking, but was, rather, a good-faith purchase from the Railroad following extensive arm's length negotiations. The court found that the Commission had rightfully assumed the position of landlord by virtue of having acquired the land "subject to all existing occupancies, leases, licenses and limitations," which encumbrances included the billboard agreements, and further found that the Commission had properly exercised its right as landlord to terminate the billboard agreements pursuant to their terms.

As to the counterclaim, the trial court determined that PMG owed the Commission $6,197.58 in unpaid license fees and was responsible as well for the $9,186.24 in costs the Commission incurred

in removing one of the billboards. Accordingly, the court entered judgment in favor of the Commission in the amount of $15,383.82.

On appeal, PMG contends that the trial court erred in holding that the Commission's acquisition of the subject property was not a taking. PMG argues that in so holding, the trial court wrongfully deprived it of its right to be justly compensated for the value of its billboards, which the Commission took when it acquired the Railroad's property. PMG further contends that, even if no taking occurred, the Railroad's assignment of PMG's leases and license to the Commission was ineffective. (PMG also raises a number of other contentions pertaining to the valuation of its billboards which we shall need to address if we agree with PMG that a taking of its billboards occurred.)

PMG is in the business of outdoor advertising. It owns or leases property on which it constructs billboards, and then leases the space on the billboards to third parties. In September 1986, PMG purchased the assets of Foster & Kleiser (F&K), a division of Metromedia, Inc., which assets included the subject billboards. The land on which the billboards were located was owned by CSX, the successor to B&O Railroad, until November 20, 1987, when it deeded title of the land to the Commission.

The Commission was created by and operates pursuant to, *inter alia*, the Water Commission Act of 1985 (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 251 *et seq.*). The stated purpose of the Commission is to provide the Du Page County area with a sufficient supply of Lake Michigan water in light of the legislature's finding that the health, safety and welfare of the residents is threatened by an ever-increasing shortage of water. (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 252.) The Commission possesses the same powers as a municipal water commission under section 11—135—1 *et seq.* of the Illinois Municipal Code (Ill. Rev. Stat. 1987, ch. 24, par. 11—135—1 *et seq.*), including the power to acquire, sell, lease as lessor or lessee, transfer or dispose of real or personal property, or its interest therein, and to condemn private property. (Ill. Rev. Stat. 1987, ch. 24, par. 11—135—6.) It is undisputed that the Commission required the subject property in order to construct and maintain a pipeline and interconnection facility to transport the Lake Michigan water to Du Page County residents.

On October 2, 1986, the Commission began negotiations with the Railroad regarding the purchase of the land. The land and applicable easements which the Commission needed for a 12-foot tunnel were appraised at approximately $259,000. Subsequently, the Commission offered to purchase from the Railroad the land and easements at

their appraised value. On October 27, 1986, the Railroad responded to the offer by stating that it was procuring its own appraisals. Thereafter, the Commission and the Railroad continued the negotiations in an effort to clarify the scope of the lands to be acquired and the specific conditions of the purchase. During these negotiations, the Railroad informed the Commission that several billboard agreements encumbered the Railroad's land, and that the sale would be subject to these agreements. Further negotiations resulted in an agreed purchase price of $360,000.

In July 1987, the Commission, by resolution, formally approved a written offer to the Railroad of $360,000 for the subject properties. The offer provided that the Railroad would convey approximately four acres of property plus certain easements to the Commission by quitclaim deed, and the conveyance would be "subject to all existing occupancies, leases, licenses or limitations." The Railroad accepted the Commission's offer on August 31, 1987. In December of that year, the Commission received the Railroad's quitclaim deed, dated November 1, 1987. Langdon Neal, special counsel for the Commission, testified at trial that the Commission never initiated or threatened to initiate a formal eminent domain proceeding against the Railroad to acquire the land, nor did the Commission regard itself as proceeding under the laws which gave it the right to exercise the power of eminent domain.

On January 26, 1988, the Railroad formally assigned PMG's leases and license to the Commission. These agreements expressly permitted termination and required PMG to remove the billboards in the event of such termination. Specifically, the leases contained the following provisions:

"TERMINATION. 13. This lease may be terminated by either party at any time upon not less than one (1) month's notice in writing sent by registered or certified mail to the other party ***.

* * *

In the event of termination of this lease, Lessee shall, within the period specified in said notice, remove all structures and other property on or about the premises except those owned by Lessor, restore the premises to a condition satisfactory to Lessor, remove, if requested by Lessor, all foundation walls and structures below the surface of the ground and fill in all excavations and vacate the premises ***.

* * *

*** [I]f Lessor shall notify Lessee to remove said structures or other property and the same are not so removed, Lessor may remove the same at the cost and expense of Lessee.

Failure or neglect of Lessor to act upon a breach of one or more of the covenants, terms and conditions of this lease shall not constitute or be construed as a waiver of such breach or any subsequent breach or of any right created thereby."

The license contained similar provisions with respect to termination:

"8—All structures, equipment and materials used under this license by the Licensee shall remain its personal property, and, so long as Licensee is not in default under the terms and conditions hereof, may be removed by the Licensee at any time up until the expiration of a period of thirty (30) days after the termination of this agreement or any extension thereof. Unless the Licensee is in default under the terms and conditions hereof, Licensee shall, at its own expense, remove all signboards and advertising structures covered by this license within a period of thirty (30) days after the termination of this agreement or any extension thereof. *** Upon the failure of the Licensee to remove the said signboards or structures, the Railroad, without notice to Licensee, (a) may perform the removal at the expense of Licensee, or (b) may take title to the signboards and structures.

9—*** This agreement may be terminated by the Railroad upon thirty (30) days' written notice. *** Upon termination by either party pursuant to the provisions of this Paragraph 9, a proportionate part of the license fee actually paid in advance shall be refunded to the Licensee. [The record reveals a subsequent change to paragraph 9 of the license which appears to require 60 days' written notice of termination by either party. For purposes of this appeal, however, the precise amount of notice is insignificant.]

10—If the Licensee shall fail to pay the annual fee or any bill presented by the Railroad for taxes, assessments or other expenses due and payable under this license within a period of thirty (30) days, Licensee shall be deemed to be in default under this agreement. *** In the event that the Licensee shall remain in default for a period of sixty (60) days or more, Railroad shall have the right by written notice to the Licensee to terminate this agreement forthwith, and at its option to take title to all signboards or structures covered thereby."

With respect to the right of assignment, the leases specifically provided:

"SUCCESSORS AND ASSIGNS. 17. The terms, covenants and provisions hereof shall inure to the benefit of and be binding upon the successors and assigns of Lessor and the heirs, personal representatives, successors and assigns of Lessee; provided, however, Lessee shall not assign, encumber or sublet this lease or any part of the premises or any rights and privileges herein granted without written consent of Lessor."

Although the license did not expressly provide for the right of assignment by the Railroad, as the leases did, it contained no language specifically restricting that right. The license permitted PMG to assign its rights upon the written consent of the Railroad.

On April 1, 1988, after the Commission had begun work on the project, it notified PMG that it was terminating the lease on one of the billboards (Billboard I) pursuant to paragraph 13 of the lease because it was interfering with the Commission's ability to dig a tunnel shaft. Up to that point, PMG had continued to operate the billboard and derive revenues from it. The Commission gave PMG the required one month's notice and requested PMG to remove the billboard on or before May 11, 1988. PMG refused, claiming that it was entitled to payment of just compensation on account of the "taking" of its billboard. The Commission maintained that it had not condemned the billboard and therefore did not owe compensation to PMG.

On May 24, 1988, PMG filed suit in the United States District Court, alleging that the Commission violated its civil rights. On June 2, 1988, after it was apparent that PMG was not going to remove the billboard, the Commission dismantled the billboard at a cost of $9,186.24. A few days later, on June 8, 1988, the district court dismissed PMG's suit for lack of subject matter jurisdiction. On June 16, 1988, PMG filed the present action.

Notwithstanding the filing of its complaint alleging a taking of its billboards and demanding just compensation, PMG continued to operate and earn substantial revenues from Billboards II and III. Beginning September 1, 1988, however, PMG ceased paying the $8,700 annual license fee due on Billboard III. Consequently, on May 18, 1989, pursuant to paragraph 10 of the license, the Commission elected to terminate effective June 16, 1989. It is uncontested that as of May 18, the total amount of fees past due was $6,197.58.

The Commission also notified PMG on May 18 that it was terminating the lease for Billboard II, pursuant to paragraph 13 contained therein. On June 16, 1989, PMG amended its complaint to add counts II and III, and petitioned the trial court for a temporary restraining order and preliminary injunction. The trial court denied PMG's request for temporary relief. Thereafter, the parties agreed to reserve their rights and PMG removed Billboards II and III from the property.

On June 22, 1992, the trial court entered judgment for the Commission and against PMG, finding that the Commission's acquisition of the subject property was not a taking. Accordingly, the Commission was not required to pay just compensation to PMG for its billboards. This appeal followed.

In *Department of Public Works & Buildings v. Kirkendall* (1953), 415 Ill. 214, 112 N.E.2d 611, our supreme court defined in concise terms the meaning of the phrase "eminent domain." The court stated:

" 'Eminent domain' is a phrase which has been used for hundreds of years to designate the power and right of the sovereign State, or those to whom its power has been delegated, to take private property within its jurisdiction for public use *without the owner's consent*, upon paying [just] compensation. [Citations.]"

(Emphasis added.) (*Kirkendall*, 415 Ill. at 217, 112 N.E.2d at 613.) In Illinois, the exercise of the power of eminent domain, or condemnation, as it is often called, is regulated by the eminent domain act (Ill. Rev. Stat. 1987, ch. 110, par. 7—101 *et seq*). In the present case, PMG contends that the Commission's acquisition of the subject property by deed was tantamount to a taking by the power of eminent domain, and argues that in the process of taking the Railroad's property, the Commission took its billboards as well, for which it wrongfully refused to pay just compensation. The Commission argues that it did not in fact "take" the Railroad's property, as that term is defined in *Kirkendall*, but rather acquired it from the Railroad by purchase, in good faith, after agreeing to the price which the Railroad had requested. The Commission maintains that the "true causes of PMG's complaints are not the Commission's actions, but the exceedingly fragile rights PMG had under the billboard agreements." None of the agreements restricted the Railroad's right to assign—indeed the leases expressly allowed it—and all were terminable upon short notice. We agree with the Commission, and for the reasons which follow, affirm the judgment of the trial court.

As the Commission points out, a free and voluntary sale of property is the antithesis of a taking through eminent domain. PMG does not dispute this. PMG contends, however, that by virtue of the fact that the Commission sought out and acquired the property for a planned public purpose, the acquisition must necessarily be a taking requiring the payment of just compensation. We do not agree.

In *Chicago Housing Authority v. Lamar* (1961), 21 Ill. 2d 362, 172 N.E.2d 790, the Chicago Housing Authority filed suit to condemn certain parcels of land for use in the development of a low-rent housing project. A jury verdict allowed the defendants only $1,000 for their property. The defendants claimed that they were entitled to additional compensation due to the precondemnation activities of the Chicago Housing Authority (CHA). The defendants had been informed of the project in August 1956. On March 30, 1957, they had sold the property on a real estate installment contract for $6,900, but the buyers apparently forfeited their contract and moved on

November 11, 1958, apparently because condemnation of the property was imminent. On November 7, 1958, defendants and the CHA had orally agreed on a voluntary conveyance for $3,250. An executed written offer was returned to the CHA on November 10, but on November 12 the CHA sent defendants a letter cancelling the offer because the property had been vacated and vandalized. The defendants alleged that, as a result of the precondemnation activities of the CHA, their property and other buildings in the neighborhood became vacant and vandalized, some buildings were acquired by the CHA and demolished, and the neighborhood consequently became so undesirable that it was difficult to find tenants, with the result that defendants' property depreciated greatly in value.

Defendants asked the court to find that a "taking" of their property occurred on November 7, 1958, the date of the unenforceable oral agreement, and not as of September 23, 1959, the date the petition to condemn was filed. After first rejecting defendants' second contention that the CHA be required to pay damages for its precondemnation activities, our supreme court held that the date of the taking was the date of the filing of the petition to condemn, *not the earlier date of the price agreement. (Lamar,* 21 Ill. 2d at 368-69, 172 N.E.2d at 794.) The court, quoting from a prior case, stated: " 'It seems obvious that the taking or damaging of land by eminent domain is not accomplished by passing resolutions or ordinances, nor by negotiating with the owner for the purchase of it, or serving notices upon him that the land may be required for public purpose. The series of corporate actions by the [municipality], complained of, cannot be said to have had the same effect upon their land as the filing of a condemnation petition. Such could not, in any sense, be held to be the taking of land or damaging of land not taken.' " *Lamar,* 21 Ill. 2d at 367, 172 N.E.2d at 793, quoting *Eckhoff v. Forest Preserve District* (1941), 377 Ill. 208, 214.

Furthermore, the eminent domain act provides for the taking of property where "the compensation to be paid *** cannot be agreed upon by the parties interested." (Ill. Rev. Stat. 1987, ch. 110, par. 7—102; see *City of Chicago v. Harrison-Halsted Building Corp.* (1957), 11 Ill. 2d 431, 143 N.E.2d 40.) What necessarily follows from this is that, where the interested parties do agree to an amount of compensation, no taking of property by the government occurs. Indeed, it is generally agreed by the courts of this State that, under the act, the exercise of the right or power of eminent domain by an authority seeking to appropriate private property may not occur *until* the authority has first attempted to reach an agreement with the owner on the amount of compensation. (*Harrison-Halsted,* 11 Ill.

2d 431, 143 N.E.2d 40; *Department of Transportation ex rel. People v. Brownfield* (1991), 221 Ill. App. 3d 565, 582 N.E.2d 209; *Lake County Forest Preserve District v. First National Bank* (1990), 200 Ill. App. 3d 354, 558 N.E.2d 721; *City of Oakbrook Terrace v. La Salle National Bank* (1989), 186 Ill. App. 3d 343, 542 N.E.2d 478.) In *Department of Transportation v. Walker* (1980), 80 Ill. App. 3d 1039, 400 N.E.2d 956, the court stated that "an attempt at agreement must be both bona fide and made in good faith by the acquiring authority *before the condemnation proceedings may be initiated.*" (Emphasis added.) (*Walker*, 80 Ill. App. 3d at 1043, 400 N.E.2d at 959.) We find it significant that our supreme court in *Harrison-Halsted* characterized the acquiring authority and property owner as "contracting parties" in the negotiation stages of their relationship and as "antagonists" only once a failure to agree upon compensation had become evident and it became necessary for the parties to go to court. (*Harrison-Halsted*, 11 Ill. 2d at 434, 143 N.E.2d at 43.) In our view, the eminent domain statute evidences a clear public policy to encourage voluntary acquisitions of property and to discourage forced appropriations through the exercise of the right of eminent domain.

Courts of other jurisdictions have taken similar views with respect to when a taking occurs. See, *e.g.*, *Petry v. City & County of Denver* (1951), 123 Colo. 509, 233 P.2d 867; *Fasciani v. Village of Ossining* (1977), 58 A.D.2d 497, 396 N.Y.S.2d 669; *Davis v. City of San Angelo* (Tex. Ct. App. 1964), 376 S.W.2d 949.

In support of its position that there was a taking of property in the present case, PMG cites *Lanning v. City of Monterey* (1986), 181 Cal. App. 3d 352, 226 Cal. Rptr. 258. The *Lanning* court reviewed an inverse condemnation suit and held that a taking had occurred. However, the court was confronted with evidence that the city and the railroad expressly agreed in their sales contract that the acquisition by the city of the subject property was in fact the essential equivalent of the latter's exercise of eminent domain. Moreover, the railroad's manager testified that the land was not for sale, that it had been the intent of the railroad to subdivide the property and make long-term leases, and that the city took the land away from the railroad. In light of this evidence, the *Lanning* court had no choice but to conclude that the city's acquisition of the subject property was an exercise of its power of eminent domain.

●1 The present case is distinguishable from *Lanning* in that, here, the record is devoid of evidence that the Railroad was coerced or otherwise forced to part with its property against its will. Indeed, the record indicates quite the contrary. Langdon Neal, special counsel for the Commission who was involved in the negotiations with the

Railroad, testified at trial that no formal condemnation proceeding was ever initiated against the Railroad, nor were threats of such a proceeding ever made. Furthermore, although the Commission possessed quick-take powers for a time-enabling it to take the property and pay just compensation at some future date—at no time did the Commission call into play these powers or threaten to do so. Our review of the parties' numerous letters and other correspondence reveals nothing which would even remotely suggest that the Railroad acted in response to a threat or perceived threat of condemnation. Indeed, in a letter from the Railroad to the Commission dated June 1, 1987, the Railroad, after pointing out that the billboard agreements were terminable upon short notice, closed by saying, "Given this information, we are now *hopeful* that this transaction can be quickly concluded." This language is indicative, not of a party being forced to sell against its will, but of a party willing and ready to consummate what ended up being a quite profitable business venture. To this end, we note that the Railroad rejected the Commission's initial offer of $259,000, demanding instead the significantly higher amount of $360,000, which the Commission agreed to pay. This further evidences a transaction more closely resembling one which would occur in the "open market" than in a condemnation situation. It is not insignificant, moreover, that the quitclaim deed conveying the property to the Commission expressly provided that the conveyance of the property was the "free act and deed" of the Railroad.

What we have in this case is an agreement between "contracting parties" (to borrow our supreme court's characterization) for the Commission to purchase all of the Railroad's interest in the property in exchange for $360,000. The sale of the property to the Commission did not destroy PMG's interests. To the contrary, the quitclaim deed expressly stated that the Commission acquired the property "subject to all existing occupancies, leases, licenses and limitations," which encumbrances included PMG's leases and license and all the rights inuring to PMG thereunder. There was every intention on the part of the Commission that the agreements governing PMG's right to keep its billboards on the property were to continue at least for their term, which was essentially at will with 30 or 60 days' notice. Indeed, PMG does not contend, nor could it, that the Railroad at any time during the period of its ownership of the land could not lawfully have terminated PMG's tenancy by giving the required notice and allowing it an opportunity to remove its billboards. When the Commission, as the successor landlord, finally exercised its right of termination under the agreements, there is no question but that it gave PMG the required notice and opportunity to remove its billboards.

■ PMG argues, however, that the Railroad's assignment to the Commission of its leases and license was ineffective, and thus the physical disruption of its billboards constitutes a taking. Although PMG acknowledges that as a general rule contract rights are freely assignable by either party (*Collins Co. v. Carboline Co.* (1988), 125 Ill. 2d 498, 532 N.E.2d 834), it maintains that such rights are not assignable if to do so would materially increase the risk of the obligor. In this case, the risk to which PMG refers is the risk that its leases and license would be terminated so that it would no longer be able to operate its billboards on the subject property. While what PMG asserts may be true in some instances (see, *e.g., United States v. Doe* (7th Cir. 1991), 940 F.2d 199), where the parties have agreed otherwise, an assignment will be valid notwithstanding the existence of such a risk. Here, the parties—PMG and the Railroad—did in fact agree otherwise; they agreed (expressly in the leases and implicitly in the license) that the assignment of the Railroad's rights under the leases and license, including the right to terminate on short notice, was permissible. When the parties negotiated the terms of these agreements, PMG did not seek to restrict the type of entity to which the Railroad could assign its rights or to include a provision prohibiting such assignment altogether. Had PMG wished to minimize the risk that its business arrangement with the Railroad would be altered, it should have done so in the contract. In short, PMG's assertion that this risk serves to render invalid the Railroad's assignment to the Commission of the leases and license is without merit.

■ In light of our finding that no taking of either the Railroad's property or of PMG's billboards occurred in this case, we need not address PMG's contentions regarding the valuation of its billboards. As to the Commission's counterclaim, PMG admits liability for the past-due license fees totaling $6,197.58. PMG also admits that, under the lease, it is responsible for the cost incurred by the Commission in removing Billboard I in the event we find that no taking of that billboard occurred. Accordingly, we uphold the trial court's judgment in favor of the Commission in the amount of $15,383.82.

For the foregoing reasons, the judgment of the circuit court of Cook County both as to PMG's claim and as to the Commission's counterclaim is affirmed.

Judgment affirmed.

RAKOWSKI and GIANNIS, JJ., concur.