Terry R. BEACHLER, Randall A. Greene, Wayne T. Neal, et al., Plaintiffs–Appellants,

v.

AMOCO OIL COMPANY, Johnson Oil Company, and Smith Oil Company of Kankakee, Defendants–Appellees.

No. 96–3091.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 22, 1997.

Decided May 1, 1997.

Robert M. Riffle (argued), Michael R. Seghetti, Elias, Meginnes, Riffle & Seghetti, Peoria, IL, Richard M. Bing, Richmond, VA, for Plaintiffs–Appellants.

David J. Zott (argued), John R. Robertson, Kirkland & Ellis, Chicago, IL, for Defendant–Appellee Amoco Oil Co.

Alphonse M. Alfano (argued), Bassman, Mitchell & Alfano, Washington, DC, for Defendant–Appellee Johnson Oil Co.

Charles E. Ruch, Jr., Peterson, Deck, Ruch & Baron, Kankakee, IL, for Defendant–Appellee Smith Oil Co.

Before CUDAHY, ROVNER, and EVANS, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

The plaintiffs in this action under the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. §§ 2801 et seq., are six individuals who operate gasoline service stations in Peoria and Springfield, Illinois pursuant to franchise agreements with Amoco Oil Company ("Amoco"). In July of last year, Amoco announced its intention to assign its agreements with these Peoria and Springfield dealers to two of its wholesale distributors and then to sell the underlying station properties to those distributors as well. The plaintiff dealers responded by filing the instant action under the PMPA, charging that the impending assignments and sales would violate that statute. Plaintiffs asked the district court to preliminarily enjoin the proposed transactions pursuant to 15 U.S.C. § 2805(b)(2). After a hearing, the district court declined the request for a preliminary injunction, and plaintiffs appealed. We have

jurisdiction pursuant to 28 U.S.C. § 1292(a)(1) and now affirm.

## I.

Amoco has traditionally marketed its petroleum products both through direct-supply dealers such as the plaintiffs, and through independent wholesale distributors or "jobbers." At the time of the proceedings before the district court, plaintiffs operated as direct-supply dealers who purchased their motor fuel directly from Amoco, reselling it to consumers at their Peoria and Springfield service stations. The franchise relationship between Amoco and these dealers was governed by two agreements: a dealer supply agreement granting the dealers the right to use Amoco's trademarks and setting forth the terms and conditions under which the dealers were entitled to purchase motor fuel from Amoco for resale, and a lease agreement defining the terms under which the dealers leased the Amoco-owned station properties.

This lawsuit was precipitated by Amoco's decision to convert its direct-supply stations in Peoria and Springfield to jobber-supplied stations. That decision was part of a nationwide strategy to convert Amoco stations in certain smaller markets from direct- to jobber-supplied operations. Amoco apparently believes that local jobbers are in a better position than it is to invest the capital required to enable such stations to remain competitive in their markets. After each submitted a detailed business plan, Amoco selected defendant Johnson Oil Company ("Johnson") as the jobber to be assigned its Peoria stations and defendant Smith Oil Company of Kankakee ("Smith") as the jobber for its Springfield stations. Under the proposed assignments, the affected dealers in Peoria and Springfield would continue to operate the same Amoco-branded service stations and to be supplied with the same Amoco motor fuel (but by the jobber rather than by Amoco itself). The dealers also would retain the right to use Amoco's trademarks.

Once Amoco's plans for the assignments and sales were finalized, affected dealers in Peoria and Springfield were notified both orally and in writing. Six of the sixteen

dealers then instituted this action under the PMPA for preliminary and permanent injunctive relief. Plaintiffs allege that the proposed assignments of their dealer supply and lease agreements would result in an illegal "termination" or "nonrenewal" of their franchises under the PMPA. They also contend that prior to selling the station properties to Johnson and Smith, Amoco was obliged to afford the occupying dealer an opportunity to purchase the property itself on the same terms and conditions that were being offered to the jobber. After filing the suit, the dealers asked the district court to preliminarily enjoin the proposed assignments and sales pursuant to 15 U.S.C. § 2805(b)(2). The district court conducted a hearing on that request on August 21, 1996, and at the conclusion of the hearing refused to issue the injunction. The court found that the plaintiff dealers had failed to establish that the proposed assignments and sales would result either in a termination or nonrenewal of their franchises under the PMPA. Based on that finding, the court also concluded that the dealers were not entitled to the opportunity to purchase their station properties before those properties could be sold to the jobbers.

Plaintiffs appealed and asked the district court to enjoin the assignments and sales while their appeal was pending. *See* Fed. R.Civ.P. 62(c). The district court refused, and plaintiffs then renewed their request here. A motions panel of this court declined to issue an injunction pending resolution of plaintiffs' appeal. As a result, the transactions plaintiffs seek to enjoin—Amoco's assignment of the dealer supply and lease agreements and its sale of the underlying station properties to Johnson or Smith-have gone forward as planned.

## II.

### A.

Recognizing the vast disparity in bargaining power between franchisors and franchisees in the petroleum industry, Congress enacted the PMPA in an attempt to level the playing field on which these parties interact. *See Beck Oil Co. v. Texaco Ref. and Mktg.,*

*Inc.,* 25 F.3d 559, 561 (7th Cir.1994); *Valentine v. Mobil Oil Corp.,* 789 F.2d 1388, 1390 (9th Cir.1986). In *Brach v. Amoco Oil Co.,* 677 F.2d 1213, 1216 (7th Cir.1982), this court identified three concerns the legislation was designed to address:

> that franchisee independence may be undermined by the use of actual or threatened termination or nonrenewal to compel compliance with franchisor marketing policies; that gross disparity of bargaining power may result in franchise agreements that amount to contracts of adhesion; and that termination or nonrenewal may disrupt the reasonable expectations of the parties that the franchise relationship will be a continuing one.

(Citing S.Rep. No. 95–731, 95th Cong.2d Sess. 17–19, *reprinted in* 1978 U.S.C.C.A.N. 873, 875–77 ("Senate Report")). The legislative history makes plain that Congress primarily was seeking "to protect 'franchisees from arbitrary or discriminatory termination or non-renewal,'" and it attempted to accomplish this goal by adopting minimum standards governing the termination or nonrenewal of a petroleum franchise. *Id.* (quoting Senate Report at 15, *reprinted in* 1978 U.S.C.C.A.N. at 874). We indicated in *Brach* that as remedial legislation, the PMPA must be given "a liberal construction consistent with its overriding purpose to protect franchisees." *Id.* at 1221; *see also Hilo v. Exxon Corp.,* 997 F.2d 641, 643 (9th Cir.1993); *May–Som Gulf, Inc. v. Chevron U.S.A., Inc.,* 869 F.2d 917, 921 (6th Cir.1989).

Yet other courts have cautioned that because the PMPA also serves to diminish the property rights of franchisors, it "should not be interpreted to reach beyond its original language and purpose." *May–Som Gulf,* 869 F.2d at 921; *see also Chestnut Hill Gulf, Inc. v. Cumberland Farms, Inc.,* 940 F.2d 744, 750 (1st Cir.1991). That sensible admonition also has its roots in the Act's legislative history, which suggests that Congress was seeking to strike a balance between the need to protect franchisees and the need to preserve for franchisors "adequate flexibility so that [they] may initiate changes in their marketing activities to respond to changing market conditions and consumer preferences."

Senate Report at 19, *reprinted in* 1978 U.S.C.C.A.N. at 877; *see also Patel v. Sun Co.,* 63 F.3d 248, 250 (3d Cir.1995); *Keener v. Exxon Co., USA,* 32 F.3d 127, 130 (4th Cir. 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Little Oil Co. v. Atlantic Richfield Co.,* 852 F.2d 441, 445 (9th Cir.1988). In that sense, then, the PMPA is properly viewed as a " 'product of compromise,' " as it " 'affords franchisees important but limited procedural rights, while allowing franchisors significant latitude in responding to changing market conditions.' " *Hilo,* 997 F.2d at 645–46 (quoting *Valentine,* 789 F.2d at 1390).

Congress' remedial purpose in enacting the PMPA is reflected in the provision providing for preliminary injunctive relief, 15 U.S.C. § 2805(b)(2). A franchisee is entitled to a preliminary injunction under the Act based upon a lesser showing than would be required in the ordinary case under Fed. R.Civ.P. 65. *Moody v. Amoco Oil Co.,* 734 F.2d 1200, 1216 (7th Cir.), *cert. denied,* 469 U.S. 982, 105 S.Ct. 386, 83 L.Ed.2d 321 (1984); *see also Sun Ref. and Mktg. Co. v. Rago,* 741 F.2d 670, 672 (3d Cir.1984); *Barnes v. Gulf Oil Corp.,* 824 F.2d 300, 306–07 (4th Cir.1987); *Khorenian v. Union Oil Co.,* 761 F.2d 533, 535–36 (9th Cir.1985). Under section 2805(b)(2), a district court is required to grant a preliminary injunction if:

(A) the franchisee shows–

(i) the franchise of which he is a party has been terminated or the franchise relationship of which he is a party has not been renewed, and

(ii) there exist sufficiently serious questions going to the merits to make such

questions a fair ground for litigation; and

(B) the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted.

15 U.S.C. § 2805(b)(2). Thus, once the franchisee establishes a termination or nonrenewal, it need only prove "a reasonable chance of success on the merits" of its claim of a PMPA violation and that the balance of hardships tips in its favor. *Moody,* 734 F.2d at 1216. The franchisee need not also establish that it would be irreparably harmed in the absence of an injunction. *Hilo,* 997 F.2d at 643; *Doebereiner v. Sohio Oil Co.,* 880 F.2d 329, 333 (11th Cir.1989), *amended by,* 893 F.2d 1275 (11th Cir.1990); *Barnes,* 824 F.2d at 307; *Khorenian,* 761 F.2d at 535.

Although most disputes about the need for a preliminary injunction under section 2805(b)(2) involve the "sufficiently serious question" and "balance of hardship" prongs of that statute, the present case concerns the threshold question of whether the franchisees have shown a termination or nonrenewal of their franchises.[1] It of course is the franchisee's initial burden under the PMPA to establish that its franchise has been terminated or not renewed (15 U.S.C. § 2805(c); *Duff v. Marathon Petroleum Co.,* 51 F.3d 741, 744 (7th Cir.1995)), and if it fails to satisfy that burden, our inquiry is at an end. In denying an injunction here, the district court found that the plaintiff dealers could not establish that the proposed assignments of the dealer supply and lease agreements in conjunction with the sale of the underlying

---

**1.** The statute actually speaks in terms of the termination of a franchise and the nonrenewal of a franchise relationship. The term "franchise relationship" is used in the context of a nonrenewal for two reasons:

> First, ... the contract which constitutes the franchise may no longer exist and the term "franchise relationship" is utilized to avoid any contention that because the "franchise" does not exist there is nothing to renew. The renewal provisions of the title address the renewal of the relationship between the parties rather than the specific rights or obligations of the parties under the franchise agreement. Sec-

> ond, because the title contemplates changes in the specific provisions of the franchise agreement at the time of renewal, the title requires renewal of the relationship between the parties as distinguished from a continuation or extension of the specific provisions of the franchise agreement.

Senate Report at 30, *reprinted in* 1978 U.S.C.C.A.N. at 888; *see also* 15 U.S.C. § 2801(2) (defining "franchise relationship"). For ease of reference, however, we shall use the term "franchise" to refer both to an existing franchise and to a "franchise relationship" under the Act.

station properties would result in a termination or a nonrenewal of their franchises, ostensibly because the franchises would remain intact but with Johnson or Smith performing all of Amoco's prior obligations. Our review of the district court's decision to deny a preliminary injunction under section 2805(b)(2) is narrowly circumscribed. We consider only whether the district court abused its discretion in denying injunctive relief. *Moody,* 734 F.2d at 1217; *see also Patel,* 63 F.3d at 251.

### B.

Although this circuit has not previously considered whether the assignment of a franchise by a refiner to a distributor constitutes a termination or nonrenewal of the franchise under the PMPA, a considerable body of case law has developed on that question in the federal courts. By and large, the courts have held that in most circumstances, the assignment of a franchise to a distributor will not rise to the level of a termination or nonrenewal so long as the essential characteristics of the franchise remain intact. *See Chestnut Hill Gulf,* 940 F.2d at 750–51; *May–Som Gulf,* 869 F.2d at 922–23; *Fresher v. Shell Oil Co.,* 846 F.2d 45, 46–47 (9th Cir.1988) (per curiam); *Ackley v. Gulf Oil Corp.,* 726 F.Supp. 353, 360 (D.Conn.), *aff'd. mem.,* 889 F.2d 1280 (2d Cir.1989), *cert. denied,* 494 U.S. 1081, 110 S.Ct. 1811, 108 L.Ed.2d 941 (1990); *see also Clark v. BP Oil Co.,* 930 F.Supp. 1196, 1207 (E.D.Tenn.1996); *Cedar Brook Serv. Station, Inc. v. Chevron U.S.A., Inc.,* 746 F.Supp. 278, 282 (E.D.N.Y. 1990), *aff'd. mem.,* 930 F.2d 908 (2d Cir.), *cert. denied,* 502 U.S. 819, 112 S.Ct. 77, 116 L.Ed.2d 50 (1991). Those courts reason that a dealer whose franchise is so assigned loses no rights that the PMPA was designed to protect because after the assignment, the dealer retains its rights under the Act if the distributor, now acting as the "franchisor,"

should decide to terminate or not to renew its franchise.[2] *See Fresher,* 846 F.2d at 47; *Cedar Brook Serv. Station,* 746 F.Supp. at 282, 283; *Ackley,* 726 F.Supp. at 363; *cf. Patel,* 63 F.3d at 252 n. 6 (suggesting that refiner's sale of station property to third party who is not a "refiner or distributor" and thus not a "franchisor" under the PMPA may result in a franchise termination or non-renewal).

The courts have recognized two important exceptions to this general rule, however. The first applies where the assignment results in a breach of "one of the three statutory components of the franchise agreement," which include "the contract to use the refiner's trademark, the contract for the supply of motor fuel, [and] the lease of the premises." *May–Som Gulf,* 869 F.2d at 922; *see also Chestnut Hill Gulf,* 940 F.2d at 750–51; *Fresher,* 846 F.2d at 46–47. If one of the three components is lost to the franchisee by virtue of the assignment, an essential characteristic of a PMPA franchise is then absent, meaning that the assignment will be deemed a termination of the franchise under the Act. Second, an assignment may also occasion a franchise termination if the assignment violates applicable rules of state law. *Chestnut Hill Gulf,* 940 F.2d at 751; *May–Som Gulf,* 869 F.2d at 922. That is because the PMPA itself neither authorizes nor prohibits the transfer or assignment of a franchise, but leaves the matter to state law. *See* 15 U.S.C. § 2806(b)(1);[3] Senate Report at 42–43, *reprinted in* 1978 U.S.C.C.A.N. at 901. If an assignment is found to be invalid under state law, it will necessarily result in a termination of the franchise that is prohibited by the Act. *Barnes v. Gulf Oil Corp.,* 824 F.2d at 304; *Barnes v. Gulf Oil Corp.,* 795 F.2d 358, 363–64 (4th Cir.1986); *see also May–Som Gulf,* 869 F.2d at 923. To summarize, then, the assignment of a franchise by a refiner to a

---

**2.** A "franchisor" under the PMPA includes "a refiner or distributor (as the case may be) who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel." 15 U.S.C. § 2801(3).

**3.** That section provides:

Nothing in this subchapter authorizes any transfer or assignment of any franchise or prohibits any transfer or assignment of any franchise as authorized by the provisions of such franchise or by any applicable provision of State law which permits such transfer or assignment without regard to any provision of the franchise.

15 U.S.C. § 2806(b)(1).

distributor generally will not implicate the PMPA unless the assignment either breaches an essential component of the statutory franchise or violates state law.

■ The plaintiffs in this case have not suggested that the assignments to Johnson and Smith would breach any of the three components of a PMPA franchise. Even after execution of the assignments, the dealers would retain the right to use Amoco's trademarks, to purchase and resell Amoco-branded motor fuel, and to occupy the leased premises under the identical lease terms. It is therefore clear that the first exception to the general rule will not apply to invalidate the assignments here. *See Chestnut Hill Gulf,* 940 F.2d at 752; *May–Som Gulf,* 869 F.2d at 923; *DuFresne's Auto Serv., Inc. v. Shell Oil Co.,* 992 F.2d 920, 928 (9th Cir. 1993).

Conceding that, plaintiffs assert that the assignments will nonetheless violate the terms of the dealer supply agreements themselves, which, according to the dealers, must be read as prohibiting any assignment by Amoco. The dealers' argument is based on the alleged absence of any provision in the agreements expressly authorizing an assignment by Amoco. They point out that the paragraph specifically addressed to assignments provides only that the dealer "shall not assign this [agreement] separate and apart from an assignment of the separate lease for the premises between Dealer and Amoco." (Dealer Supply Agreement para. 21.) Because this provision only addresses the possibility of an assignment by the dealer and is silent as to an assignment by Amoco, the dealers insist that such an assignment is forbidden. That becomes even more clear, the dealers assert, when the assignment provision is read in conjunction with the agreement's integration clause, which provides that no "obligations, agreements or understandings" shall be implied from the terms of the dealer supply agreement, as all such "obligations, agreements and understandings" have been set forth therein. (*Id.* at para. 23.) The dealers thus accuse Amoco of attempting to circumvent the integration clause by implying a right to assign the agreements.

■ But as Amoco points out, another provision plainly contemplates that the dealer supply agreements may be assigned by Amoco to jobbers like Johnson and Smith. The pricing provision of the agreements states: "If this Agreement is assigned by Amoco to an Amoco jobber, the prices to be paid by [the] Dealer for motor fuel and other products hereunder shall be as established by said jobber." (*Id.* at para. 4.) In Illinois, moreover, a contract for the sale of goods is generally assignable by either party even in the absence of a provision specifically authorizing an assignment, unless the parties have agreed otherwise. *See* 810 ILCS 5/2–210(2);[4] *Collins Co. v. Carboline Co.,* 125 Ill.2d 498, 127 Ill.Dec. 5, 11, 532 N.E.2d 834, 840 (1988); *Patrick Media Group, Inc. v. DuPage Water Comm'n,* 258 Ill.App.3d 1068, 196 Ill.Dec. 793, 800, 630 N.E.2d 958, 965 (1994). This Illinois rule applies to the dealer supply agreements here, as the parties agree that those contracts are governed by Illinois law. With that as the general rule, the agreements' assignment provision cannot be read as plaintiffs suggest, for if assignments generally are permissible unless otherwise agreed, then the provision here reflects the parties' agreement that there would be but one limitation on a dealer's right to assign and no limitations on Amoco's right. We think it clear, therefore, that the assignments to Johnson and Smith are not forbidden by the agreements themselves.

■ Yet even if the assignments do not breach the dealer supply agreements, plaintiffs still contend that they are invalid under Illinois law because those assignments would "increase materially the burden or risk im-

---

4. Section 2–210(2) of the UCC, as adopted in Illinois, provides as follows:

Unless otherwise agreed all rights of either seller or buyer can be assigned except where the assignment would materially change the duty of the other party, or increase materially the burden or risk imposed on him by his contract, or impair materially his chance of obtaining return performance. A right to damages for breach of the whole contract or a right arising out of the assignor's due performance of his entire obligation can be assigned despite agreement otherwise.

810 ILCS 52/2–210(2).

posed" on the dealers by the agreements or would "impair materially [their] chance of obtaining return performance." 810 ILCS 5/2–210(2). Whether an assignment will be proscribed under Illinois law for either of those reasons "is a question to be decided on the facts of a particular case." *Collins,* 127 Ill.Dec. at 11, 532 N.E.2d at 840.

The primary burden feared by the dealers is that the price at which they are able to purchase Amoco-branded motor fuel will increase if they are required to purchase from Johnson or Smith as opposed to Amoco itself. But reliance on the possibility of a price increase is unavailing to these dealers for two reasons. First, the dealer supply agreements do not fix the price at which the dealers will be entitled to purchase Amoco motor fuel; instead, the dealers are entitled to purchase fuel at Amoco's "dealer buying price" in effect in the particular pricing area. (Dealer Supply Agreement para. 4.) Amoco itself therefore has the right under the dealer supply agreements to raise the price at which motor fuel will be sold to the dealers, and when that is the case, the possibility that an assignee-distributor may charge a higher price generally will be insufficient to constitute a material burden. *See May–Som Gulf,* 869 F.2d at 924; *Clark,* 930 F.Supp. at 1205–06; *Cedar Brook Serv. Station,* 746 F.Supp. at 283; *Ackley,* 726 F.Supp. at 363. Yet there is no materially increased burden here for an even more fundamental reason—the dealers expressly agreed that they would accept the price established by the jobber in the event of an assignment. (*See* Dealer Supply Agreement para. 4 ("If this Agreement is assigned by Amoco to an Amoco jobber, the prices to be paid by Dealer for motor fuel and other products hereunder shall be as established by said jobber.").) In light of that, the dealers cannot now assert that the possibility of a price increase gives rise to a materially increased burden under

section 2–210(2) of the UCC. *See Patrick Media Group,* 196 Ill.Dec. at 800, 630 N.E.2d at 965.[5]

In addition to the possibility of higher fuel prices, the dealers also think it likely that Johnson or Smith will raise the rent they must pay to lease the station properties. But again, the leases provide Amoco with the option of raising the monthly rent on a yearly basis to conform with Amoco's established rental policy for the type of facility at issue. (Lease Agreement para. 5.) Thus, if Johnson or Smith were to raise the rent charged to a dealer in accordance with this provision, it would merely be invoking a right reserved to Amoco in the lease agreement. The possibility that it may do so therefore does not serve to materially increase the dealers' burdens under their contracts.

Finally, the dealers also assert that Johnson or Smith could under a variety of circumstances lose the right to distribute Amoco-branded motor fuel or to use Amoco's trademarks, thereby impairing the dealers' rights as well. Because there is no comparable risk for a direct-supply dealer, plaintiffs believe that this materially increases their risks under the assigned contracts and materially impairs their chance of obtaining return performance. No court has yet accepted this type of argument, however, and we are unwilling to be the first. Initially, the risk to which the dealers point is purely speculative—Johnson and Smith currently possess the right to distribute Amoco products as well as the right to use Amoco's trademarks, and there is nothing in the record to indicate that those circumstances are likely to change. Thus, to accept plaintiffs' argument on this record would essentially mean that any assignment by a refiner to a distributor would be invalid under UCC § 2–210(2). If Johnson or Smith were for some reason to lose those rights in the future, however, they

---

5. Also because of that agreement, this case cannot be likened to *Barnes v. Gulf Oil Corp.,* 795 F.2d 358, 363–64 (4th Cir.1986), on which the dealers rely. In *Barnes,* the Fourth Circuit found that an assignment to a distributor may materially increase the dealer's burden because it required the dealer to purchase motor fuel at a price significantly higher than that stipulated in the franchise agreement. Here, however, there

is no evidence that Johnson or Smith will charge higher prices to the dealers, let alone prices that exceed a stipulated price by $1,000 per month, as in *Barnes.* And even if Johnson or Smith were to sell to the dealers at higher prices, that could not establish a materially increased burden under these supply agreements because the dealers expressly agreed to accept whatever price an assignee-jobber might impose.

would thereby breach the franchise agreements with their respective dealers, entitling the dealers to bring suit under the PMPA at that point. *E.g., Fresher,* 846 F.2d at 47. The speculative nature of the risk and the existence of a PMPA remedy if it should be realized means that the unlikely scenario posed by the dealers cannot constitute a materially increased burden or risk under section 2–210(2). *See May–Som Gulf,* 869 F.2d at 923 ("plaintiffs cannot prove an increased risk that they will be denied use of the Gulf trademark, but merely speculate that Cumberland will breach the *trademark* component of their franchise agreements." (emphasis in original)); *Ackley,* 726 F.Supp. at 363.[6]

Because the dealers have not established that the assignments would be invalid under Illinois law, or that those assignments would serve to breach any of the components of a statutory franchise, they have failed to show that the assignments would give rise to a termination or nonrenewal under the PMPA. The district court correctly concluded that absent such a showing, the dealers were not entitled to preliminary injunctive relief. *See* 15 U.S.C. § 2805(b)(2)(A)(i).

## C.

■ The dealers also contend that regardless of the validity of the assignments, Amoco had the obligation before selling the station properties to provide them with the opportunity to purchase pursuant to 15 U.S.C. § 2802(b)(3)(D)(iii). That section applies in the event that a franchisor will not be renewing a franchise relationship at the conclusion of the term because it has decided in good faith and in the normal course of its business to sell the station premises. 15 U.S.C. § 2802(b)(3)(D)(i)(III). The nonrenewal of the franchise relationship in that circumstance will not run afoul of the PMPA so long as the franchisor complies with the Act's notice requirements (*see* 15 U.S.C. § 2804) and either:

(I) [makes] a bona fide offer to sell, transfer, or assign to the franchisee such franchisor's interests in such premises; or

(II) if applicable, offer[s] the franchisee a right of first refusal of at least 45–days duration of an offer, made by another, to purchase such franchisor's interest in such premises.

15 U.S.C. § 2802(b)(3)(D)(iii); *see also Patel,* 63 F.3d at 251; *Slatky v. Amoco Oil Co.,* 830 F.2d 476, 479 (3d Cir.1987) (en banc). The dealers contend that because Johnson or Smith, rather than Amoco, will be making renewal decisions at the end of the existing franchise terms, Amoco has successfully extricated itself from the franchise relationships at the same time that it has decided to sell the underlying station properties. The dealers therefore assert that the assignments, even if valid, should be characterized as "anticipatory nonrenewals," which, in conjunction with the sales of the station properties, are sufficient to trigger their purchase rights under section 2802(b)(3)(D)(iii).

We agree with the district court that in the circumstances of this case Amoco was not required to afford the dealers an opportunity to purchase their station properties before selling to Johnson or Smith in conjunction with the assignments. As the statute makes clear, the opportunity to purchase need only be afforded a dealer if the franchise relationship is not being renewed. *See, e.g., Cinco J, Inc. v. Boeder,* 920 F.2d 296, 300 (5th Cir. 1991); *see also* Senate Report at 36, *reprinted in* 1978 U.S.C.C.A.N. at 894–95. As we indicated above, the dealers have been unable to establish that the assignments in this

---

**6.** In an attempt to bolster their contention that the assignments would materially increase their burdens and risks and materially impair their chance of obtaining return performance, the dealers submitted to the district court the affidavit of an expert in the petroleum industry who believes that such assignments significantly alter a dealer's competitive position. The district court struck the affidavit, however, believing that the opinions expressed there were too speculative because they were not based on a proper

factual foundation. We have carefully reviewed the expert's affidavit, and we cannot say that the district court abused its discretion in striking that submission. *See In re Sheridan,* 57 F.3d 627, 634–35 (7th Cir.1995) (decision to exclude expert testimony reviewed for an abuse of discretion); *see also Minasian v. Standard Chartered Bank, PLC,* 109 F.3d 1212, 1216 (7th Cir.1997) (affidavit of expert inadmissible where no data provided to support the opinion offered).

case will result either in a termination or in a nonrenewal of their franchises. Instead, after the assignments, the essential characteristics of the existing franchises will remain, but with Johnson or Smith substituted for Amoco as the franchisor. *See* 15 U.S.C. § 2801(1)(B)(iii) (term "franchise" under the PMPA includes the unexpired portion of a franchise transferred or assigned as authorized by the provisions of the franchise or of state law). Moreover, because Johnson and Smith both qualify as "franchisors" under the Act (*see* 15 U.S.C. § 2801(3)), a dealer whose franchise relationship is not renewed by either of those parties at the expiration of the existing franchise term would be protected under the terms of the PMPA. As a result, the dealer's reasonable expectation "that the [franchise] relationship will be a continuing one" is not disturbed by Amoco's decision to assign the franchises and to sell the underlying properties. *See* Senate Report at 18, reprinted in 1978 U.S.C.C.A.N. at 876; *cf. Patel*, 63 F.3d at 257–58 (Sarokin, J., dissenting) (arguing that sale of premises during franchise term to a party not bound by the PMPA may give rise to a termination or nonrenewal under the Act). Because they have not established a nonrenewal of their franchises, then, the dealers do not currently have a right under the PMPA to purchase the station properties.

### III.

For the foregoing reasons, we agree with the district court that the dealers have failed to establish that the assignments and sales in this case would result in the termination or nonrenewal of their franchises under the PMPA. Absent such an event, the dealers are not entitled to preliminary injunctive relief.

AFFIRMED.