Prakash H. PATEL and Shobha
P. Patel, h/w, Appellants,

v.

SUN COMPANY, INC. and
Lancaster Associates.

No. 94–2092.

United States Court of Appeals,
Third Circuit.

Argued Feb. 3, 1995.

Decided Aug. 21, 1995.

Dimitri G. Daskal (argued), The Daskal Law Group, Washington, DC, Edward T. Rostick, Williams & Scheetz, Richboro, PA, for appellants.

James M. Brogan (argued), Christopher W. Wasson, Piper & Marbury, Philadelphia, PA, for appellee Sun Co., Inc.

John F. Fox, Jr. (argued), Law Offices of John F. Fox, Jr., Philadelphia, PA, for appellee Lancaster Associates.

Before: SCIRICA, ROTH, and SAROKIN, Circuit Judges.

## OPINION OF THE COURT

ROTH, Circuit Judge:

This appeal represents the latest chapter in plaintiffs' ongoing effort to obtain injunctive relief under the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801 *et seq.* Specifically, plaintiffs, operators of a service station, have sought a preliminary injunction to prevent defendants from refusing to renew plaintiffs' franchise and from evicting them from the franchise location, which plaintiffs have occupied since 1978. Plaintiffs' initial request for injunctive relief was denied on the ground that the event required to trigger the enforcement provisions of the PMPA, termination or nonrenewal of a franchise, had not yet occurred. Now that the required nonrenewal has clearly occurred, the question presented by this appeal is whether injunctive relief is still an available remedy for these plaintiffs against these defendants.

I.

Defendant Sun Company, Inc., ("Sun") is a refiner and marketer of motor fuels. In 1978, plaintiffs Prakash and Shobha Patel, husband and wife, entered into a lease and franchise relationship with Sun for the operation of a Sunoco service station. At the time of this original agreement, Sun owned the real estate on which the service station was located. This parcel also contained an office building with a parking lot.

In December 1987, Sun sold the entire parcel of land to defendant Lancaster Associates ("Lancaster").[1] Lancaster leased the service station back to Sun through September 30, 1994, and granted Sun the right to sublease it. Sun then offered to sublease the service station to the Patels for a period of three years. The sublease agreement specifically stated that Sun's right to grant possession of the premises would be subject to an underlying lease which would expire on September 30, 1994. The sublease agreement also clearly stated that the underlying lease "might expire or nonrenew at the expiration of the initial term or any renewal option thereof."

On May 17, 1988, before the sublease agreement had been signed, the Patels filed suit in the Eastern District of Pennsylvania, alleging that Sun and Lancaster had violated the PMPA. The Patels claimed that the PMPA entitled them to a right of first refusal before the franchise location could be sold and that Sun had failed to grant them this right or to offer to sell the property to them.[2] Accordingly, the Patels asserted that they were entitled to injunctive relief and money damages under the PMPA. On May 20, 1988, the Patels signed the sublease with Sun.[3]

In October 1988, the district court denied the Patels' motion for a preliminary injunc-

---

**1.** Lancaster is neither a refiner nor a distributor of motor fuels. Additionally, Lancaster is not a subsidiary of, nor does it have any other relationship with, Sun beyond the purchase of the real estate here in question.

**2.** The parties dispute whether Sun offered to sell the service station premises to the Patels before selling to Lancaster. The district court did note during the 1988 proceedings that: "The franchi-

sor has sold the premises without first offering plaintiff-franchisees a chance to purchase." *Patel v. Sun Ref. & Mktg.* 710 F.Supp. 1023 (E.D.Pa. 1989) ("*Patel II*").

**3.** The Patels assert that they signed this renewal, with its notice of the lease expiration, because they had no choice. Supplemental Appendix at 132.

tion, holding that the statutory precondition for injunctive relief, nonrenewal of the franchise, had not yet occurred. *Patel v. Sun Ref. & Mktg. Co.*, No. 88–3958, slip op. at 1–2 (E.D.Pa. Oct. 14, 1988) ("*Patel I* "). On motion for reconsideration, the court affirmed its holding but invited the Patels to recast their complaint as one for declaratory judgment. *Patel v. Sun Ref. & Mktg. Co.*, 710 F.Supp. 1023, 1024 (E.D.Pa.1989) ("*Patel II* ").

Although the Patels amended their complaint, the district court again denied their request for relief under the PMPA on the ground that the triggering act required under the statute, nonrenewal of the franchise, had not yet occurred. *Patel v. Sun Ref. & Mktg. Co.*, 1992 WL 25737, at *2 (E.D.Pa. 1992) ("*Patel III* "). The Patels did not appeal this order.

Meanwhile, in December 1991, the Patels and Sun executed another sublease extending the term to August 20, 1994. This new sublease, like its predecessor, explicitly stated that Sun's right to grant possession of the premises was subject to its underlying lease with Lancaster, which would expire on September 30, 1994.

On April 28, 1994, 120 days before the expiration of the sublease, Sun notified the Patels that their franchise and sublease would not be renewed due to the expiration of Sun's underlying lease with Lancaster. The underlying lease between Sun and Lancaster expired on September 30, 1994.

After receiving notice from Sun that their franchise would not be renewed, the Patels in July 1994 commenced the instant action in district court, again alleging that the nonrenewal of their franchise was improper under the PMPA because Sun had not offered the Patels a right of first refusal before the sale to Lancaster, nor had it offered to sell the property to the Patels. In deciding the Patels' motion for a preliminary injunction, the district court found that, because Sun's sale of the premises to Lancaster did not constitute a termination or nonrenewal of the franchise, the Patels' rights under the PMPA were not triggered at that time. *Patel v. Sun Co.*, 866 F.Supp. 871, 873 (E.D.Pa.1994) ("*Patel IV* "). The court further held that

Sun's loss of the right to grant possession of the premises due to the expiration of its underlying lease with Lancaster was a valid reason for nonrenewal under the PMPA and that, therefore, no serious question existed regarding the merits of the Patels' PMPA claim. *Id.* at 873–74. Accordingly, the Patels' motion for a preliminary injunction was denied. The Patels appealed, and we granted a stay pending appeal.

## II.

The PMPA regulates the relationship between motor fuel distributors, principally oil refiners, and their franchisees, principally retail gas station operators. Prior to the passage of the PMPA, evidence suggested that "distributors had been using the threat of termination or nonrenewal to compel franchisees to comply with the distributor's marketing policies ... [and] to gain an unfair advantage in contract disputes." *Slatky v. Amoco Oil Co.*, 830 F.2d 476, 478 (3d Cir.1987) (in banc) (citing S.Rep. No. 731, 95th Cong., 2d Sess. 17–19, 1978 U.S.C.C.A.N. 873, 875–77) ("Senate Report"). Accordingly, in passing the PMPA, Congress sought to "protect a franchisee's 'reasonable expectation' of continuing the franchise relationship while at the same time insuring that distributors have 'adequate flexibility ... to respond to changing market conditions and consumer preferences.'" *Id.* (quoting Senate Report at 19, 1978 U.S.C.C.A.N. at 877).

In order to effectuate these purposes, the PMPA prohibits distributors from terminating or nonrenewing franchises, unless the termination or nonrenewal is based upon one of the enumerated grounds set forth in the statute. 15 U.S.C. § 2802. Most of the enumerated exceptions involve franchisee misconduct, which is not alleged in this case. *See, e.g.*, § 2802(b)(2)(C) (termination based upon franchisee's failure to pay sums due under the franchise agreement); § 2802(b)(3)(B) (nonrenewal based upon "bona fide customer complaints" about franchisee's operations); § 2802(b)(3)(C) (nonrenewal based upon franchisee's failure to operate property "in a clean, safe, and healthful manner").

In addition to the exceptions for franchisee misconduct, the PMPA also authorizes non-renewal for a limited set of business reasons, two of which are involved in the instant appeal. First, a distributor may fail to renew a franchise agreement if the distributor decides to sell the premises "in good faith and in the normal course of business." § 2802(b)(3)(D)(i)(III). In such a case, however, the distributor must either have offered to sell the premises to the franchisee, § 2802(b)(3)(D)(iii)(I), or have offered the franchisee a right of first refusal of the purchaser's offer, § 2802(b)(3)(D)(iii)(II). Second, a distributor may fail to renew a franchise agreement upon the "occurrence of an event which is relevant to the franchise relationship and as a result of which ... nonrenewal of the franchise is reasonable." § 2802(b)(2)(C). One "relevant event" recognized in the statute is the franchisor's loss of its "right to grant possession of the leased marketing premises through expiration of an underlying lease." § 2802(c)(4).[4]

Section 2805(a) of the statute creates a civil cause of action for franchisees against franchisors for violations of the statute. In these civil actions, courts are free to exercise "such equitable relief ... necessary to remedy the effects" of the PMPA violation. § 2805(b)(1). This equitable relief includes, but is not limited to, preliminary injunctions. *Id.* Section 2805(d) also provides for an award of actual and exemplary damages and of attorney and expert witness fees to a franchisee who prevails in a civil action against a franchisor. Section 2805(e) then provides an exception to an award of injunctive relief in that the court may not compel a continuation or renewal of a franchise if the franchisor has demonstrated to the court that the nonrenewal of the franchise was caused by the decision of the franchisor, made in good faith and in the normal course of business, to convert, alter, or sell the premises or to withdraw from marketing fuel oil in that geographic market area.

## III.

We review the district court's conclusions of law in a plenary fashion, its findings of fact under a clearly erroneous standard, and its decision to grant or deny an injunction for abuse of discretion. *Johnson & Johnson–Merck Consumer Pharmaceuticals Co. v. Rhone–Poulenc Rorer Pharmaceuticals,* 19 F.3d 125 (3d Cir.1994).

## A.

We begin our analysis of the instant appeal with plaintiffs' request for an injunction against Lancaster. Plaintiffs' cause of action against both defendants arises out of § 2805(a) of the PMPA which reads, in relevant part:

If a franchisor fails to comply with the requirements of section 2802 or 2803 of this title, the franchisee may maintain a civil action *against such franchisor.*

§ 2805(a) (emphasis added). In the PMPA, "franchisor" is defined as:

a refiner or distributor ... who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

§ 2801(3). Thus, the application of the PMPA is limited to causes of action arising between franchisees and franchisors engaged in the petroleum marketing field. It is clear from the facts presented in this case, however, that Lancaster is not a refiner or distributor of motor fuel, and therefore falls outside the literal scope of the statute. For this reason, the Patels cannot obtain relief against Lancaster under the PMPA.

Plaintiffs maintain, however, that Lancaster, as the purchaser of the property, should be "charged with notice of Sun's obligations under [the] PMPA" and should hold "title subject to those obligations." Complaint, ¶ 24. We find this argument unpersuasive. Plaintiffs fail to indicate any evidence, either in the text of the PMPA or in its legislative history, that the PMPA was meant to apply

---

4. In 1994, Congress amended the "loss of underlying lease" exception by requiring a franchisor to offer to assign to the franchisee "any option to extend the underlying lease or option to purchase the marketing premises that is held by the franchisor." Pub.L. No. 103–371, 103d Cong., 2d Sess., 108 Stat. 3484–85. That amendment is not applicable to the present case.

beyond the franchisee-franchisor relationship. *Cf. Barnes v. Gulf Oil Corp.* 824 F.2d 300, 303–04 (4th Cir.1987) (permitting individuals or small companies to qualify as "franchisors" would permit large refiners and distributors to terminate their relationship with a franchisee by assigning the remainder of the franchise term to small enterprises with limited resources). Moreover, it would seem beyond any legal or practical ability of Lancaster to license the Patels to use the Sun trademarks or to provide the Patels with petroleum products for retail sale. Therefore, because the language of the statute is unambiguous, we find no reason to apply the PMPA to Lancaster.[5]

## B.

Our analysis turns next to the Patels' request for an injunction against Sun. The criteria that courts are to consider in determining whether to grant a preliminary injunction under the PMPA are set out in § 2805(b)(2) of the act, which reads in relevant part:

[T]he court shall grant a preliminary injunction if—

(A) the franchisee shows—

(i) the franchise of which he is a party has been terminated or the franchise relationship of which he is a party has not been renewed, and

(ii) there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation; and

(B) the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted.

§ 2805(b)(2).

In denying the Patels' motion for a preliminary injunction, the district court determined that no sufficiently serious questions regarding the merits existed to warrant a balancing of the hardships. In reaching this conclusion, the district court relied in part on the judgment that "[w]hen Sun sold the station to Lancaster it did not terminate or fail to renew the Patels' franchise relationship." *Patel IV*, 866 F.Supp. at 873.[6]

▇ Our determination to deny the Patels' motion for a preliminary injunction against Sun is not, however, based upon this conclusion. It is based on § 2805(e) which bars an injunction that would require a franchisor to continue a franchise in a location which the franchisor, in good faith and in the normal course of business, has decided to sell.[7] In other words, if a franchisor does not want to take over a franchise itself or to transfer it to another dealer, but simply for business reasons wants to close down its retail operations in a certain location, the PMPA will not enjoin a franchisor from doing so provided the decision is made in good faith and in accordance with the requirements of § 2804.

If the franchisor does attempt to close down the franchise location without meeting the requirements of § 2802, however, it may be liable in damages to the franchisee. Al-

---

5. The dissent argues in Part V that Lancaster took title to the real property, knowing of Sun's obligations as a franchisor under the PMPA and thereby is subject to the same responsibilities with respect to the property as was Sun. For the reasons stated by the court in *Barnes*, however, we cannot agree that a petroleum refiner/distributor should be able to pass on all or part of its obligations under the PMPA to a third party who does not qualify as a franchisor under the PMPA.

6. This conclusion echoes the conclusion reached earlier in *Patel I*, *Patel II*, and *Patel III*. In those cases, the determination that the sale of the property did not constitute a termination or nonrenewal of the Patels' franchise led the court to

find that the Patels' rights under the PMPA had not yet been triggered.

Unlike the court in these earlier decisions, we are not confident that Sun's sale of the station to Lancaster did not constitute an action sufficient to trigger the Patels' rights under the statute. It is important to note, however, that the Patels could have appealed the decisions in *Patel II* and *Patel III*, but chose not to. Accordingly, this Court must decide the instant appeal in light of the parties' current positions.

7. The dissent, citing the legislative history, argues that § 2805(e) applies only to permanent, not to preliminary, injunctions. The language of the statute does not, however, make that distinction.

though § 2805(e) does not permit a permanent injunction maintaining the franchise under these circumstances, it does provide for the franchisee to recover actual damages and reasonable attorney and expert witness fees if, for instance, the franchisor has failed to offer to sell the premises to the franchisee prior to a sale to a third party.

■ Because the record here demonstrates that Sun did not take over the franchise in order to operate it for its own account or to lease it to a new tenant, *see* § 2802(b)(2)(E), we conclude that the district court could not enter a permanent injunction requiring Sun to continue the Patels' franchise at its present location. In view of the provisions of § 2805(e), we find that the denial of the injunction by the district court was not erroneous.

Clearly, one cannot help but feel some sympathy for the Patels. At the time of their initial attempt to obtain injunctive relief, they were sent away and told to seek such relief when their franchise was not renewed. Now, having returned to court after the occurrence of the nonrenewal, they are told that they are not eligible for injunctive relief. The Patels still have, however, the opportunity to present to the district court their contention that the nonrenewal of their franchise violates § 2802 because the reason given for nonrenewal, the expiration of the underlying lease, was a condition created by the franchisor when it sold the property without offering the franchisee an opportunity to purchase it. Even if injunctive relief is no longer available to the Patels, the PMPA does provide for awards of damages and fees to a franchisee who is successful in a civil action against a franchisor. 15 U.S.C. § 2805(d) and (e).[8]

Additionally, we note that the language of the statute may have complicated the Patels' situation. If there is a gap in the provisions of the PMPA, it should be corrected by Congress if Congress decides that this gap could undermine its intent in passing the PMPA. This decision, however, belongs with Congress and not with the courts.

## IV.

In conclusion, we will affirm the district court's denial of the Patels' request for a preliminary injunction against Sun and Lancaster. The Patels, however, still have the opportunity to seek damages under the PMPA. Accordingly, we will remand this matter to the district court for further proceedings consistent with this opinion.

SAROKIN, Circuit Judge, dissenting:

I respectfully dissent because I believe that the majority opinion permits franchisors to circumvent one of the most fundamental protections afforded by Congress to franchisees under the PMPA—namely the right to purchase the franchise premises if the franchisor elects to sell. The majority holds that the franchisor's obligation to offer to sell to the franchisee can be avoided simply by postponing the nonrenewal or termination of the franchise to a time subsequent to the title closing.

While the statute does permit the franchisor to sell its premises for valid economic reasons, it grants an important corollary right to the franchisee to protect its investment in the premises by affording it an opportunity to purchase the premises if the sale will result in the termination or nonrenewal of the franchise. At a minimum, the unique circumstances presented here establish fair grounds for litigation and thus warrant the issuance of a preliminary injunction. Accordingly, I would reverse the denial and remand for entry of injunctive relief.

8. The dissent states that "[t]he majority holds that the franchisor's obligation to offer to sell to the franchisee can be avoided simply by postponing the nonrenewal or termination of the franchise to a time subsequent to the title closing." Dissent op. at 253; *see also id.* at 258 ("The majority opinion, however, holding that a sale-without-offer followed by expiration of an underlying lease makes nonrenewal reasonable, allows franchisors to completely dispense with the bona fide offer requirement."). We do not so hold. Instead, we hold that a franchisor that fails to offer the property to its franchisee before selling to another is liable to the franchisee for damages, but may not be enjoined from the sale, provided the transaction is made in good faith and in the normal course of business, with the requisite notice.

## I.

In addition to the facts set forth in the majority opinion, the following are significant.

At the time that Lancaster purchased the parcel of land from Sun in December 1987, plaintiffs allege that pursuant to the purchase and sale agreement, Sun indemnified Lancaster for any PMPA claims arising out of the transaction. Although plaintiffs have not supplied the court with this agreement, the parties acknowledged the existence of an indemnification clause at oral argument before the district court. Supplemental Appendix ("S.A.") at 16, 148–50.

After purchase, Lancaster leased the franchise location back to Sun for six years, through September 30, 1994, and granted Sun the right to sublease the property. According to the testimony of its general partner, it was Lancaster's expectation at the time of purchase that upon the expiration of the lease-back in 1994, Sun would remove the underground fuel tanks, clean the soil, and "put the property back into its existing condition without any oil tanks or environmental problems." S.A. at 151. Thus, as of December 1987 plaintiffs' ability to continue in business at the franchise location was due to expire no later than September 1994.

After completing the sale and taking the lease-back from Lancaster, Sun offered a three-year sublease to plaintiffs. Recognizing that Sun's sale to Lancaster represented a threat to the continuation of their franchise, plaintiffs immediately brought suit in district court in May 1988, alleging that Sun and Lancaster had violated the PMPA. Only after filing suit did plaintiffs sign the sublease.

An "Amendment and Ratification" to the sublease stated:

*UNDERLYING LEASE*

Company's right to grant possession of the Premises to Dealer is subject to an underlying lease which contains an initial term of *Six years; Nine Months and Seven Days* (*6Years, 9Months & 7Days* ) years, [sic] from *12/23/87* to *9/30/94* with *NO RENEWALS* which lease might expire or nonrenew at the expiration of the initial term or any renewal option thereof.

S.A. at 220. It was thus evident to the Patels that any opportunity they had to sublease the premises from Sun and thereby continue their franchise operation would be permanently lost upon termination of Lancaster's lease to Sun. When asked at a hearing in the instant litigation whether he executed the 1988 sublease, Mr. Patel replied, "Yes, I had no choice." S.A. at 132.

After the district court rejected the plaintiff's request for an injunction in *Patel I* and then again on motion for reconsideration in *Patel II*, plaintiffs amended their complaint to seek a declaratory judgment at the invitation of the court. The court repeated its conviction that "the PMPA does give to the franchisee the right of first refusal in the event of the franchisor's non-renewal," but dismissed the complaint because nonrenewal had not yet occurred. *Patel v. Sun Refining and Marketing Co.*, 1992 WL 25737 at *1 (E.D.Pa.1992) ("*Patel III* "). The district court made clear that "[i]f such an event occurs, plaintiffs will have the protection of the PMPA at their disposal." *Id.* at *2. Plaintiffs did not appeal.

Nonrenewal, identified by the district court in 1988, 1989, and 1992 as the *sine qua non* of a PMPA claim for relief, has now occurred. In Spring 1994, Sun notified plaintiffs that their franchise and sublease would not be renewed because of the expiration of Sun's lease-back with Lancaster. Plaintiffs promptly commenced this action, arguing that their PMPA claims were now ripe and, as they have maintained since 1988, that the 1987 sale between Sun and Lancaster could not extinguish or reduce their rights under the Act.

The district court denied plaintiffs' motion for a preliminary injunction, relying on the earlier ruling that Sun's sale of the premises did not "trigger" plaintiffs' rights under the Act, but ignoring the corollary that upon nonrenewal, those rights would attach. *Patel v. Sun Co.*, 866 F.Supp. 871, 872 (E.D.Pa. 1994) ("*Patel IV*").

Thus, when plaintiffs first sought injunctive relief, it was denied on the grounds that notwithstanding the sale, their franchise re-

mained in effect. They were assured, however, that if and when the franchise was adversely affected, then their rights would be protected. But injunctive relief was likewise denied when nonrenewal actually occurred, on the grounds that it was not the sale but rather the expiration of the lease-back which resulted in the nonrenewal. In essence, the district court told the Patels in 1988 that their claims were too early and in 1994 that their claims were too late!

## II.

The PMPA regulates the relationship between motor fuel distributors and their franchisees. A principal reason for Congress' passage of the PMPA was to protect franchisees from having their businesses subject to termination at the hands of unscrupulous franchisors. As noted by the majority, evidence at Congressional hearings on the PMPA "indicated that distributors had been using the threat of termination or nonrenewal to compel franchisees to comply with the distributor's marketing policies ... [and] to gain an unfair advantage in contract disputes." *Slatky v. Amoco Oil Co.*, 830 F.2d 476, 478 (3d Cir.1987) (in banc) (citing S.Rep. No. 731, 95th Cong., 2d Sess. 17–19, 1978 U.S.C.C.A.N. 873, 875–77) ("Senate Report"). In response to such evidence, Congress passed the PMPA to prevent large petroleum companies from exploiting franchisees. *See O'Shea v. Amoco Oil Co.*, 886 F.2d 584, 587–88 (3d Cir.1989); *see also Sun Refining & Marketing Co. v. Rago*, 741 F.2d 670, 673 (3d Cir.1984) ("major thrust" of PMPA is "to protect franchisees from arbitrary or unfair termination"); *Barnes v. Gulf Oil Corp.*, 824 F.2d 300, 304–05 (4th Cir.1987) (PMPA's "principal concern" is "protection of franchisees"); *Khorenian v. Union Oil Co.*, 761 F.2d 533, 535 (9th Cir.1985) (PMPA must be construed liberally to achieve legislative goal of protecting franchisees); *Darling v. Mobil Oil Corp.*, 864 F.2d 981, 982 (2d Cir.1989) (PMPA directed at "the David versus Goliath aspect of the relationship between the small

retailer franchisee and the giant petroleum company franchisor").

The statute achieves this purpose by enacting the general rule that no distributor may terminate or fail to renew a franchise, except for enumerated reasons and upon adequate notice. § 2802(a). Most exceptions involve franchisee misconduct, which is not an issue in this case. *See* § 2802(b)(2)(A) & (B), (b)(3)(B) & (C). To enforce the general rule against termination or nonrenewal, the Act establishes a private right of action for a franchisee whose franchise has been terminated or not renewed. This court has described the Act as creating "a presumption that any termination of a franchise is unlawful." *Rago*, 741 F.2d at 672.

As stated by the majority, nonrenewal of a lease by a franchisor is permitted by the PMPA for a limited number of business decisions, two of which are at issue here. First, a distributor may fail to renew the franchise agreement of a franchisee who leases property from the distributor if "in good faith and in the normal course of business" the distributor decides to sell the premises, provided the distributor first offers the property for sale to the franchisee. § 2802(b)(3)(D).

Second, the PMPA permits a distributor to nonrenew the agreement upon "occurrence of an event which is relevant to the franchise relationship and as a result of which ... nonrenewal of the franchise is reasonable." § 2802(b)(2)(C). One "relevant event" which, by the statute's own definition renders nonrenewal reasonable, is the loss of the franchisor's "right to grant possession of the leased marketing premises through expiration of an underlying lease." § 2802(c)(4).[1]

## III.

I begin my analysis with the Patels' request for an injunction against Sun. The enforcement provisions of the PMPA grant the district court broad powers to remedy the effects of a franchisor's failure to comply with the Act, including the authority to enter interim equitable relief. § 2805(b)(1). Un-

---

1. In 1994 Congress amended the "loss of underlying lease" exception by requiring a franchisor to offer to assign to the franchisee "any option to extend the underlying lease or option to purchase the marketing premises that is held by the franchisor." Pub.L. 103–371, 103rd Cong., 2nd Sess., 108 Stat. 3484–85.

der the relaxed standard for a preliminary injunction, an aggrieved franchisee must show (1) a franchise has been terminated or not renewed; (2) there are sufficiently serious questions going to the merits to make such questions a fair ground for litigation; and (3) the balance of hardships tips in favor of the franchisee. § 2805(b)(2). The second prong establishes a lower standard than the traditional requirement that a moving party demonstrate a substantial likelihood of success on the merits. *Rago,* 741 F.2d at 672. In this case, the district court determined that plaintiffs could not satisfy the second prong and denied relief. *Patel IV,* 866 F.Supp. at 873.

### A. Termination or nonrenewal of the franchise

Plaintiffs and Sun are indisputably franchisees and franchisor respectively, as defined by the PMPA. §§ 2801(2), (3). Unlike in the previous case, the franchise has been non-renewed, and the first prong is satisfied.

### B. Sufficiently serious questions going to the merits to make such questions a fair ground for litigation

Sun maintains that it did not violate the general prohibition on nonrenewal because (1) the 1987 sale of the premises to Lancaster did not terminate or nonrenew the franchise, and thus its duty to offer plaintiffs the premises under § 2802(b)(3)(D) did not arise; and (2) the expiration of its underlying lease with Lancaster in 1994 is a "relevant event" under § 2802(c)(4), necessarily making nonrenewal reasonable under § 2802(b)(3)(C). The district court agreed.

The question before us is whether the exception to the prohibition on nonrenewal invoked by defendants creates fair grounds for litigation, because of the sequence of these events.

### 1. The "sale" exception

A franchisor may nonrenew a franchise based on its sale of the franchise location, provided the franchisor first makes a bona fide offer to sell to the franchisee. § 2802(b)(3)(D). *See Slatky, supra.* The parties dispute whether Sun offered plaintiffs

the premises before selling them to Lancaster.

However, in the previous action, the district court commented that Sun "has sold the premises, without first offering plaintiff-franchisees a chance to purchase." *Patel II,* 710 F.Supp. at 1023. *See also Patel III,* 1992 WL 25737 at *1 ("Sun . . . sold the premises to defendant Lancaster Associates without first offering to plaintiffs an opportunity to purchase the land"). Here, the district court stated that the Patels had sued "based on the prior failure of Sun to offer the property to them for sale or to offer them a right of first refusal when Sun sold the property to Lancaster in 1987," *Patel IV,* 866 F.Supp. at 873, but ultimately it made no explicit finding as to whether Sun had made a bona fide offer to plaintiffs before selling to Lancaster.

If Sun did make a bona fide offer, then defendants should be entitled to rely on the "sale exception" to the general prohibition on nonrenewal, provided the other elements of that exception are also met; if Sun made no offer, then defendants may not justify the 1994 nonrenewal on this basis.

### 2. The "relevant event" exception

A franchisor may end a franchise if an event relevant to the franchise relationship occurs which makes termination or nonrenewal "reasonable." § 2802(b)(2)(C). This exception (which I will refer to as the "relevant event" exception) does not depend on the franchisor providing the franchisee a right of first refusal. A different section of the Act provides that one relevant event which makes nonrenewal reasonable is "loss of the franchisor's right to grant possession" of the franchise location. § 2802(c)(4). Sun maintains that the 1994 nonrenewal comported with the "relevant event" exception, because pursuant to § 2802(c)(4) the expiration of its lease-back necessarily made nonrenewal "reasonable."

First, I reject Sun's argument that § 2802(c)(4) establishes a *per se* rule. Congress itself has explained that the loss of the right to grant possession does not always satisfy the reasonableness requirement of the relevant event exception:

[i]t is not intended that termination or non-renewal should be permitted based upon the expiration of a lease which does not evidence the existence of an arms length relationship between the parties and as a result of the expiration of which no substantive change in control of the premises results.

Senate Report at 38, 1978 U.S.C.C.A.N. at 896. Thus, there can be no *per se* rule.

Second, the circumstances described in the Senate Report do not exhaust those in which expiration of an underlying lease fails to satisfy the "relevant event" exception. Rather, the legislative history indicates that a court must give at least minimal scrutiny to the asserted "relevant event," even if that event is arguably enumerated at § 2802(c). Thus, although plaintiffs have supplied no evidence that the transaction between Sun and Lancaster was anything but at arms length, this does not end our inquiry, even assuming good faith.

Here, we are faced with a series of "relevant events" in which (1) the franchisee entered the franchise relationship when the franchisor held title to the franchise location; (2) the franchisor sold the property to a party that does not refine or distribute motor oil; and (3) the franchisor non-renewed the franchise when its lease-back expired. For the purposes of this section, moreover, I will assume *arguendo* that Sun failed to make a bona fide offer to the Patels before the 1987 sale. Finally, I note that testimony by Lancaster's general partner indicated that it was Sun's intention in 1987 to nonrenew the franchise in 1994.

Under these circumstances, I conclude that plaintiffs have established that the question whether Sun's loss of the right to grant possession is a relevant event making nonrenewal reasonable presents fair grounds for litigation. Several theories inform this conclusion.

First, the 1987 sale-without-offer was the "but for" cause of the 1994 expiration of the underlying lease. Because Lancaster is neither a refiner nor distributor of motor fuel, the 1987 sale eroded plaintiffs' franchise rights, jeopardized its business, and positioned Sun to evade the Act in a manner I believe Congress sought to proscribe. Even when nonrenewal does not occur at the moment of sale, the risk does, because the franchisee's rights are immediately diminished. *See, e.g., Wagnon v. Wilkins Distributing,* No. C85–829R, slip. op., May 21, 1986 (W.D.Wash. May 22, 1986) (franchisor's sale of premises to party not bound by PMPA, without offering property to franchisee, diminished franchisee's "inchoate rights").

Second, one must distinguish between franchise relationships in which the franchisor holds an underlying lease *at the outset* of the relationship and those in which the franchisor's fee interest is unilaterally reduced to a leasehold after the commencement of the franchise. In the first instance, the franchisee enters the relationship with knowledge that it is subject to nonrenewal or termination upon expiration of the underlying lease, or any other event provided for therein. The franchisee can accept or reject the relationship fully cognizant at the outset of the risks involved. Here, however, when the Patels chose to commence their relationship with Sun in 1978, Sun's control of the franchise location was not subject to an underlying lease which could limit the duration of the franchise.

Third, the testimony that as of December 1987 Sun planned to nonrenew may prevent Sun from establishing that it complied with the special notice requirement of the "relevant event" exception. *See* § 2802(b)(2)(C). All exceptions require notice 90 days before nonrenewal. §§ 2802(b)(1), 2804. The "relevant event" exception, however, adds the further requirement that the franchisor provide notice of nonrenewal *"not more than "* 60–120 days after it has "acquired actual or constructive knowledge" of the relevant event. § 2802(b)(2)(C). If Sun had knowledge in 1987 that its lease-back would not be extended in 1994, then its notice was seven years late.

Fourth, in the previous case between plaintiffs and Sun, the district court warned Sun that in the event of nonrenewal, plaintiffs "will have the protection of the PMPA at their disposal." *Patel III,* 1992 WL 25737 at *2. *See also Patel II,* 710 F.Supp. at 1024

(franchisor's sale of the franchise location "cannot justify non-renewal of the franchise unless the franchisor did allow the franchisee to purchase").

Fifth, this conclusion comports with the legislative intent that the PMPA protect the reasonable expectations of franchisees from unscrupulous franchisor practices. *Slatky*, 830 F.2d at 478–79. The particular scheme at issue here, while not considered previously by our circuit, is precisely the sort of practice Congress sought to prevent. The 1994 PMPA amendments, which increased the protections for a franchisee when the franchisor seeks to sell a franchise location, confirms that abusive franchisor practices remain an important Congressional concern. *See* Pub.L. 103–371, 108 Stat. 3484.

Finally, a contrary holding is akin to writing into the PMPA an enormous new exception to the general prohibition on nonrenewal. Such an outcome is incompatible with the Congressional intent that the reasonable expectations of franchisees be protected, while at the same time the business judgment of franchisors be respected. *Slatky*, 830 F.2d at 478. The provision that a franchisor may sell in good faith so long as the franchisee is offered a right of first refusal accomplishes this legislative purpose. The majority opinion, however, holding that a sale-without-offer followed by expiration of an underlying lease makes nonrenewal reasonable, allows franchisors to completely dispense with the bona fide offer requirement. The sale can take place without first offering the premises to the franchisee, followed by nonrenewal after the expiration of a lease-back, no matter how brief.

I conclude that when a franchisor owns a franchise location at the commencement of the franchise relationship but sells it to a party that does not refine or distribute motor fuel, without making the franchisee a bona fide offer to sell and with the intention of non-renewing upon expiration of the franchisor's lease-back, then upon actual nonrenewal there are fair grounds for litigation whether or not the "relevant event" exception has been satisfied. I would leave for trial final disposition of the claim, including, if necessary, proof of the elements of the "relevant event" exception.

This conclusion is not undermined by the Patels' execution of two subleases with Sun, each of which informed the franchisees of the imminent loss of Sun's right to grant possession. First, before signing the 1988 sublease, the Patels sought to protect their rights by filing the first lawsuit. Second, knowing that the sale had already been consummated, the Patels had absolutely no choice but to accept the terms and conditions proposed by Sun. Sun's cross-examination of Mr. Patel makes this point manifest:

Q And, sir, isn't that correct that after the sale of this property to Lancaster Associates in January of 1988, you were offered and you entered into a lease for the premises from 1988 through 1991?

A Yes, I had no choice.

S.A. at 132.

Nor would I treat the execution of the 1988 sublease as the commencement of a "new" franchise relationship, one entered by the Patels with full knowledge that Sun would lose the right to grant possession of the premises in September 1994. By 1988 the Patels had already spent a decade developing the good will of their business. The first franchise agreement with Sun, executed in 1978, commenced the franchise relationship.

Nor finally am I persuaded by Sun's reference to cases in which a franchisor's loss of an underlying lease satisfied the "relevant event exception," because in each case the franchise relationship commenced when the franchisor held a lease, not title, to the franchise location. *See Hutchens v. Eli Roberts Oil Co.*, 838 F.2d 1138, 1140 (11th Cir.1988); *Veracka v. Shell Oil Co.*, 655 F.2d 445, 446–47 (1st Cir.1981); *Atkins v. Chevron USA Inc.*, 672 F.Supp. 1373, 1375 (W.D.Wash. 1987). In these cases the franchisees were on notice at the outset of the possible loss of the underlying lease and could not reasonably expect that the franchisor's control of the property would continue indefinitely. Isolated from the sale-without-offer, Sun's loss of the right to grant possession may make nonrenewal reasonable, but expiration of the lease-back cannot and should not be analyzed separately from the other relevant

circumstances. Consequently, if Sun made a bona fide offer to the Patels before selling to Lancaster, then it may invoke the "sale" exception to the general prohibition on nonrenewal. If there was no offer, plaintiffs have established sufficiently serious questions whether or not Sun has satisfied the "relevant event" exception to make the issue fair grounds for litigation.

### C. Balance of hardships

The district court did not reach this element. If the district court were to find on remand, which I deem appropriate, that Sun did not make a bona fide offer before the 1987 sale, then the court should determine whether plaintiffs have satisfied the final prong of the preliminary injunction standard, although it clearly appears established based upon the undisputed facts. *See Barnes,* 824 F.2d at 306 (balance of hardships under PMPA invariably tips in favor of small franchisee rather than large franchisor).

### IV.

Sun maintains that even if plaintiffs have met the standard for issuance of a preliminary injunction, § 2805(e) bars a preliminary injunction when the basis for nonrenewal is the good faith sale of the premises. Throughout this case, Sun has sought to characterize its nonrenewal as based on the expiration of the underlying lease, rather than the sale of the premises. If the basis for nonrenewal is indeed the expiration of the lease-back, then by its own terms § 2805(e) does not apply.

Even if the basis for nonrenewal were the 1987 sale, the Patels contend that § 2805(e) applies only to permanent injunctions. The sole court of appeals to consider this question held that the structure, purpose, and legislative history of the PMPA compel the conclusion that § 2805(e) does not apply to preliminary injunctions. *Hilo v. Exxon Corp.,* 997 F.2d 641, 647 (9th Cir.1993). I agree.

The plain language of § 2805(b)(2) makes issuance of a preliminary injunction mandatory when the three-pronged standard is met: "the court *shall grant* a preliminary injunction if. . . ." This provision is admittedly in

tension with the language of § 2805(e)(1), which provides that a court "*may not* compel a continuation or renewal of the franchise relationship" in certain circumstances. Thus we must look beyond the text of the statute.

First, Congress's overriding purpose in enacting the PMPA was to protect a franchisee's reasonable expectation of continuing the franchise relationship. *Slatky,* 830 F.2d at 478; *Rago,* 741 F.2d at 672.

Second, the structure of § 2805, entitled "Enforcement Provisions," suggests a linear, chronological development of the subsections: subsection (a) establishes a private cause of action; (b) provides for interim equitable relief and sets forth the standard for issuance of a preliminary injunction; (c) establishes the burdens of proof at trial; (d) provides for legal remedies, including actual and exemplary damages, fees and costs; and (e) provides a limitation on equitable relief. *See Hilo,* 997 F.2d at 644–45.

Third, the legislative history strongly indicates that Congress intended § 2805(e) to apply only to permanent injunctions. The Senate Report repeatedly characterized § 2805(e) as limiting only permanent relief:

> An equitable defense to *permanent* injunctive relief is set forth in section [2805(e) ]. The court is barred from issuing *permanent* injunctive relief if [the elements of § 2805(e) are met]. . . . Such a defense to *permanent* injunctive relief does not affect the right of the franchisee to recover [damages and fees]. . . . Under [§ 2805(e) ], the court could not issue a *permanent* injunction against the nonrenewal. . . . It should be stressed, however, that the court may issue *permanent* injunctive relief or award damages pursuant to [§ 2805(d)(1) ] if either the 'good faith' or the 'normal course of business' requirement specified in [§ 2805(e)(1)(A) ] is not met.

Senate Report, 1978 U.S.C.C.A.N. at 899–900 (emphasis added).

Finally, I agree with the Ninth Circuit that as a matter of policy a "request for a preliminary injunction should not be made the occasion for a mini-trial on the issue of good faith." *Hilo,* 997 F.2d at 646. It makes sense to reserve for trial proof of the ele-

ments of the § 2805(e) defense, including the basis for the nonrenewal, good faith on the part of the franchisor, and proper § 2804 notice.

Thus § 2805(e) does not apply to preliminary injunctions and should not bar entry of interim relief here. The provision would remain available to Sun as a defense at trial, if the district court determined that the basis for nonrenewal is indeed the 1987 sale. At that time Sun would carry the burden of establishing that the elements of § 2805(e) are satisfied.

## V.

Lancaster contends that it is not a franchisor bound by the PMPA. To meet the Act's definition of a "franchisor," a party must be a refiner or distributor of motor fuel. § 2801(3). The parties have stipulated that Lancaster is not a refiner or distributor of motor fuel. S.A. at 21–22.

Plaintiffs maintain, however, that Lancaster, as purchaser from Sun, "is charged with notice of Sun's obligations under PMPA and holds title subject to those obligations." Complaint, ¶ 24. The relevant obligation here is the PMPA's requirement that a franchise relationship not be terminated or nonrenewed except upon one of the Act's enumerated grounds. § 2802(a).

First, the Pennsylvania Supreme Court has long held that "it is the duty of a purchaser of real property to make inquiry respecting the rights of the party in possession and failing to do so they are affected with constructive notice of such facts as would have come to his knowledge in the proper discharge of that duty." *Malamed v. Sedelsky*, 367 Pa. 353, 80 A.2d 853, 855 (1951). *See also Pato v. Cernuska*, 342 Pa.Super. 609, 493 A.2d 758, 760 (1985). In addition, that Lancaster bargained for an indemnification provision against all PMPA claims in its purchase agreement with Sun suggests that Lancaster had at least constructive notice of the Patels' statutory rights.

Second, under Pennsylvania law a purchaser takes subject to the rights of the party in possession:

> Any person who acquires title to real property by descent or purchase shall be liable to the same duties and shall have the same rights, powers and remedies in relation to the property as the person from whom title was acquired.

68 Pa.S. § 250.104. *See, e.g., DeMarco v. Philadelphia*, 90 Pa.Commw. 224, 494 A.2d 875, 876 (1985); Casner, *American Law of Property* § 3.59 at 307–08 (1952) ("[a] transferee of the reversion who is a purchaser for value . . . takes subject to the lease if he has actual or constructive notice of it").

These principles apply to a tenant's right of first refusal, as the Pennsylvania Supreme Court instructed purchasers long ago:

> '[A] tenant being in possession under a lease, with an agreement in his pocket to become the purchaser, those circumstances altogether give him an equity, repelling the claim of a subsequent purchaser, who made no inquiry as to the nature of his possession.' Knowledge of an option to purchase is within the range of what such an inquiry bindingly reveals.

*Atlantic Refining Co. v. Wyoming Nat'l Bank*, 356 Pa. 226, 51 A.2d 719, 724 (1947) (quoting Lord Eldon in *Taylor v. Stibbert*, 2 Ves. 437).[2]

That the duties imposed on Lancaster arise under a statute rather than a lease does not affect the purchaser's obligation to discharge those duties:

> An obligation that is imposed on one of the parties to a lease . . . may be imposed by operation of law. The location of the burden and benefit of that obligation after a transfer of an interest in the leased property depends on what is appropriate to further the purposes of imposing the obligation.

Restatement (Second) of Property § 16.3(2) (1977). Congress and this court have made clear the "purposes of imposing" the PMPA's

---

**2.** Interestingly, in *Atlantic Refining* the Pennsylvania Supreme Court also held that a tenant who occupies a portion of a larger parcel and possesses a right of first refusal as to the "demised premises" may exercise his right to purchase only the demised portion. The tenant's right does not entitle it to purchase the entire parcel. *Atlantic Refining*, 51 A.2d at 722–23.

obligations: protecting the reasonable expectations of franchisees while allowing franchisors to exercise their business judgment. *Slatky*, 830 F.2d at 478.

Consequently, like any other purchaser of land in Pennsylvania, Lancaster (1) had a duty to inquire into the rights of the party in possession of the premises; (2) is charged with constructive and actual notice of those rights; and (3) took subject to those rights, whether those rights arose by express or implied promise or by operation of law. Put differently, Lancaster is in privity of estate with the Patels and took subject to those obligations previously held by Sun which touch and concern the property.[3] I make no suggestion that Lancaster is required to perform any functions as a franchisor of petroleum products.

This conclusion is not inconsistent with Congressional intent. "[T]he legislative history of the PMPA indicates that in an extraordinary situation, a landlord of premises used in a franchise operation may owe certain duties to the franchisee, even though the landlord is not a franchisor." *Bsales v. Texaco, Inc.*, 516 F.Supp. 655, 661 (D.N.J.1981).

Lancaster thus has purchased the property subject to Sun's duty not to terminate or nonrenew the Patels' franchise, except upon various enumerated grounds. § 2802(a). By failing to extend the lease-back with Sun or offering a lease or sale directly to the Patels, however, Lancaster has caused the nonrenewal of the franchise. Lancaster could not invoke the "relevant event" exception raised by Sun, as Lancaster retains the right to grant possession to the premises. Nor could Lancaster rely on the "sale" exception unless it can demonstrate that Sun made a bona fide offer to the Patels or Lancaster itself made a bona fide offer, then or now.

Such a resolution of plaintiffs' motion for preliminary injunction would comport with the Pennsylvania law of property as well as the PMPA's broad goals. During the pendency of the litigation, Sun's sale of the property would be undisturbed; the Patels would continue in business at the franchise location or purchase the property outright; and ultimately, Lancaster would either retain or receive fair market value for the property.

This holding would not prevent Lancaster from raising any statutory or equitable defense at trial. Lancaster would also be free to argue that it changed position to its detriment if it reasonably relied on the rulings in the previous action. As previously noted, however, Lancaster purchased ten months before the first ruling in the previous action, and if it made any changes or improvements to the property, it did so in the face of the warnings in *Patel II* and *III* that upon nonrenewal the Patels could vindicate their PMPA rights.

## Conclusion

The PMPA permits a franchisor who owns a franchise location to sell it for valid business reasons; the Act also protects the franchisee by affording it a corollary right of first refusal if the franchisor seeks to nonrenew the franchise based on the sale. Thus the franchisor may sell, but the franchisee may continue at the location notwithstanding the sale if the franchisee elects to purchase. If the franchisee does not purchase, its franchise is subject to termination or non-renewal.

The franchisor is also permitted to end a franchise relationship when a relevant event makes nonrenewal reasonable. Yet Congress intended that a franchisee's reasonable expectations be protected, and we must interpret the PMPA in light of this legislative purpose. Hence, when a franchisor holds title to the franchise location at the commencement of the franchise relationship, sells the premises to a party who is not a refiner or distributor of motor fuel without offering it to the franchisee with the intention of later non-renewing the franchise, then there are fair grounds for litigation whether or not such events satisfy the "reasonableness" standard of the relevant event exception.

---

3. Even if Lancaster was not directly subject to the PMPA, it would nonetheless be subject to the court's inherent equitable powers. I would deem it appropriate to exercise this court's equitable jurisdiction over Lancaster under the extraordinary circumstances herein.

As the district court concluded in the previous litigation, however, the language of the Act does indicate that a franchisee may not be able to vindicate its rights until actual termination or nonrenewal has occurred. *See* §§ 2805(b)(2), 2805(c). Thus, even if a franchisee learns the franchisor is attempting to sell or has sold the franchise location without offering it to the franchisee, the franchisee may not be entitled to judicial relief until actual termination or nonrenewal takes place. But the time for such relief has now arrived.

As a purchaser Lancaster is subject to the same obligations in respect to the property only as the seller Sun. Lancaster was under a duty of inquiry, is charged with constructive and actual notice of the rights of the parties in possession, and took subject to the contractual and statutory rights of those parties. The majority's holding, however, allows a franchisor to extinguish a franchisee's rights by selling first and non-renewing later. This outcome protects the franchisor's right to sell, but defeats the franchisee's right to continue in business at the franchise location.

A franchisor should not be able to avoid the prohibition on nonrenewal simply by establishing a sale in good faith and postponing the termination or non-renewal to some date beyond the closing. A purchaser who participates in such a transaction takes subject to the rights of the franchisee. The PMPA was designed to protect franchisees who have invested time and money in developing a business at a specific location. A franchisor should not be permitted to circumvent the statute and its policies by voluntarily and unilaterally altering the franchise relationship and subjecting the franchise to an earlier termination or nonrenewal on grounds for which the franchisor did not bargain and the franchisee did not anticipate, and which deprive the franchisee of the very protection which the statute was intended to provide.

For the foregoing reasons I would reverse the order of the district court and remand with the direction that if the district court were to find that neither Sun nor Lancaster made a bona fide offer to the Patels and the balance of hardships tips in favor of plaintiffs, then a preliminary injunction be en-

tered consistent with this opinion, upon such terms and conditions as the district court would deem appropriate. However, in the event of such findings, such order should preliminarily enjoin defendants from (1) terminating or non-renewing plaintiffs' lease and franchise on the grounds that the underlying lease between Sun and Lancaster expired in 1994; or (2) terminating or non-renewing plaintiffs' lease and franchise on the grounds that the property was sold in 1987.